Danny HAMILTON, Appellant,

v.

**COMMONWEALTH of Kentucky,**
**Appellee.**

Supreme Court of Kentucky.

Oct. 28, 1977.

As Modified On Denial of Rehearing
Jan. 10, 1978.

the word itself is unconstitutional and, along with "man" and "woman," is slated for extinction.

Joseph J. Grace, James U. Glanville, Paducah, for appellant.

J. Albert Jones, Commonwealth's Atty., 2nd Judicial Dist., Paducah, Robert F. Stephens, Atty. Gen., B. F. Radmacher, III, Asst. Atty. Gen., Frankfort, for appellee.

JONES, Justice.

Danny Hamilton appeals from a judgment sentencing him to 20 years' imprisonment pursuant to a jury verdict finding him guilty of murder under the provisions of KRS 507.020(1)(b).

The sole question presented by this appeal is whether the trial court erred in instructing the jury that it could find the defendant guilty of murder under KRS 507.020(1)(b), which defines murder as a homicide committed wantonly under circumstances manifesting extreme indifference to human life. Hamilton contends that the evidence was not sufficient to sustain his conviction of murder under that section and that it was the duty of the trial court not to instruct the jury it could find him guilty of murder.

In order that the issue be resolved this court deems it necessary to detail the pertinent facts presented to the jury.

On February 15, 1976, at about 12:30 A.M., in the city of Paducah, Kentucky, Patsy Ann Davidson was killed in a collision between her car and Hamilton's truck. Several witnesses at the scene of the accident identified Hamilton as the driver of the truck. At the time of the collision, Ms. Davidson was driving her automobile south on 13th Street. Hamilton was operating his truck east on Broadway. Ms. Davidson was thrown from her car onto the curb and died later that night from a crushed skull.

Richard Caneer testified he was driving east on Broadway, a one-way street, when Hamilton passed him. Caneer testified that his speed was 30 or 35 miles per hour, and that Hamilton was going at least twice that fast. On cross-examination, Caneer admitted that he had previously testified at the coroner's inquest and at that time had estimated Hamilton's speed to be between 50 and 55 miles per hour. After passing Caneer, Hamilton's truck moved into the right lane, then veered back into the left lane to avoid hitting a car stopped at the intersection of 13th Street and Broadway. Caneer testified that the traffic light on Broadway was red, but that Hamilton continued through the intersection. Ms. Davidson was driving on 13th Street through the intersection of 13th and Broadway. She had the green light for "go" when Hamilton's truck collided with her vehicle.

Billy Wheeler was driving on 13th Street directly behind Ms. Davidson. He testified that he and Ms. Davidson had stopped at a red light at 13th and Jefferson Streets prior to proceeding to the Broadway intersection. He testified that the light at 13th and Broadway changed to green before either he or Ms. Davidson reached the intersection, and that Ms. Davidson continued to operate her car through the intersection. At that point, Hamilton's truck struck Ms. David-

son's car. Wheeler was asked, "Q. How far out in the intersection was she when she [Ms. Davidson] was hit? A. She was just starting across the street when his [Hamilton's] truck came in the turn lane like he was going to come back this way." Wheeler testified that "He [Hamilton] was going down Broadway in the turning lane. He was in the turning lane because there were two cars already there." On being asked, "Where did it strike her car?" he replied, "about middle-ways."

Virginia Morris, Wheeler's sister, was in the car with Wheeler. She also observed the collision. Her testimony was substantially the same as that of her brother. Hamilton did not deny driving the truck, but testified that the light was green. He testified that he had no memory of the collision or the events afterwards.

There is an abundance of evidence that Hamilton behaved in a bizarre fashion after the collision. Caneer, several police officers, and the ambulance attendant testified that there was a noticeable odor of alcohol on Hamilton's breach. Caneer described Hamilton's behavior as unruly and boisterous. There was testimony from Caneer, Virginia Morris, and some of the police officers that Hamilton attempted to flee from the police and had to be apprehended. Eddie Hamilton, a police officer, testified that Danny Hamilton was saluting and calling out serial numbers as if he were in the military service. A breathalyzer test given to Hamilton at 2:25 A.M., some two hours after the accident, showed a level of 0.20%. A blood sample from Hamilton, tested by chemists for the Kentucky State Police Crime Laboratory, registered a level of 0.18%. Under the provisions of KRS 189.-520(c) it is provided that, "If there was 0.10 per cent (1/10%) or more by weight of alcohol in such blood, it shall be presumed that the defendant was under the influence of intoxicating beverages."

There is much evidence as to Hamilton's activities prior to the fatal accident. According to his own testimony and that of other witnesses, Hamilton was at the Blue Ribbon Lounge in Paducah the evening of February 14, 1976, from 7:30 P.M. or 8:00 P.M. until sometime after midnight. Hamilton did not recall how much he drank, but the bartender testified that she served him 5 or 6 beers, and that she finally "cut him off" because she thought he had drunk too much. There is some conflict in the testimony of others at the bar as to Hamilton's intoxication. John Teas testified on direct examination that Hamilton did not act drunk. The security guard at the Blue Ribbon Lounge testified that Hamilton was drunk and smelled of alcohol. Hamilton pretended to be a narcotics agent and threatened to pull a gun and make a "bust" at the Blue Ribbon Lounge. He called the police to report what he fancied to be a drug transaction. However, he was removed from the lounge by Mr. Teas at gunpoint. Hamilton denied that he had claimed to be a narcotics agent or that he was armed. He testified that when he left the lounge a car with two men followed him, and that he was scared, as he felt he was being chased. No other evidence was introduced as to the automobile that Hamilton claimed was following him.

The statute under which Hamilton was convicted provides:

"A person is guilty of murder when: (b) Under circumstances manifesting extreme indifference to human life, he *wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person.*" (Emphasis added). KRS 507.-020(1).

Hamilton argues that the facts in this case are not within the ambit of that section of the statute, supra. He contends that "mere speeding and intoxication are not sufficient to sustain a conviction for murder because the defendant [Hamilton] did not have the culpable state of mind required." Hamilton noted his objections at three junctures in the proceedings. He first filed a motion to quash the indictment. Next, he moved for a directed verdict at the close of the case for the prosecution, and finally, moved for a directed verdict at the close of his defense. All motions were denied.

In the instructions to the jury, the trial court followed Palmore's pattern instructions verbatim. Palmore, *Kentucky Instructions to Juries*, § 2.03. He instructed the jury on murder, second degree manslaughter and reckless homicide. Under the definition of mental states proscribed by KRS 501.020(3), the court defined "wantonly":

"A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. *A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto.*" (Emphasis added).

At common law, every homicide not excusable or justifiable was either murder or manslaughter. If the slayer was actuated by malice, express or implied, he was guilty of murder; in the absence of malice, the crime was manslaughter. Voluntary manslaughter is only slightly less culpable conduct than murder. The distinction as illustrated by the learned Justice Holmes is as follows:

"To explode a barrel of gunpowder in a crowded street, and kill people, is murder, although the actor hopes that no such harm will be done. But to kill a man by careless riding in the same street would commonly be manslaughter. *Perhaps, however, a case could be put where the riding was so manifestly dangerous that it would be murder.*" Holmes, The Common Law, p. 60.

Neither party cites a Kentucky case which imposes a murder conviction in the case of a vehicular collision. Indeed, both suggest this may be a case of first impression under the new Kentucky Penal Code. Both counsel for Hamilton and the Attorney General for the Commonwealth, in excellent briefs, turn to other jurisdictions for cases involving similar circumstances.

"It has been generally recognized that a vehicular homicide can justify a charge of murder where evidence discloses the requisite elements of murder in general." 21 A.L.R.3d 116, 124. The courts of ten states and the District of Columbia have held that "the defendant's intoxication at the time of the fatal occurrence in question has been considered a significant, if not controlling, factor in upholding the sufficiency of the evidence to sustain a conviction for murder in many vehicular homicide prosecutions." 21 A.L.R.3d 116, 150.

The concept of negligent murder has been recognized in Kentucky for many years. As early as 1891, the accused, without reason, intentionally fired a gun into a crowded room and killed an occupant. This court held:

"[I]t is clearly established that the appellant, without lawful excuse, intentionally fired the pistol in a room crowded with persons. If he did this, not with the design of killing any one, but for his diversion merely, but killed one of the crowd, he is guilty of murder; for such conduct establishes 'general malignity and recklessness of the lives and personal safety of others, which proceed from a heart void of just sense of social duty, and fatally bent on mischief.' And whenever the fatal act is committed deliberately, or without adequate provocation, the jury has a right to presume that it was done with malice." *Brown v. Commonwealth*, Ky., 17 S.W. 220 (1891), at p. 221.

In another case involving conduct comparable to that described in *Brown*, supra, the accused intentionally shot into a motor vehicle knowing it to be occupied. This court described the conduct constituting the offense as an act committed "In a reckless manner and without lawful excuse and without regard for human life." *Hill v. Commonwealth*, 239 Ky. 646, 40 S.W.2d 261, 263 (1931).

In the *Hill* case, supra, this court held that jurors should be instructed on the of-

fense of voluntary manslaughter. For a conviction the death-causing conduct had to involve a great deviation from the standard of reasonable behavior. The court most often labled this type of conduct as "reckless and wanton carelessness," and as "negligent voluntary manslaughter."

In 1926 this court accepted the view that the crime of voluntary manslaughter could be committed by an unintentional homicide. The case involved the death of a small child struck by an automobile. In reversing and remanding the case because the terms "wanton" and "reckless" conduct were not defined in the instructions, the court clarified the law on unintentional homicides as it then existed. It said:

"If [the defendant] operates [his automobile] upon the highway in a manner that he knows or has reasonable grounds to believe is reasonably calculated to injure others using the highway, and under such circumstances recklessly, wantonly and with gross carelessness strikes and kills another this constitutes voluntary manslaughter." *Jones v. Commonwealth*, 213 Ky. 356, 281 S.W. 164, 167 (1926).

The concept of negligent voluntary manslaughter caused much confusion, because this court failed to distinguish clearly between "gross negligence" and "wanton and reckless carelessness." It finally concluded that the standard for measuring criminality of the defendant's conduct was dependent upon the instrumentality used to cause death. In 1939, under statutes then existing, this court upheld a conviction of voluntary manslaughter on a charge that the accused while intoxicated was driving an automobile which struck and killed a pedestrian. *Newcomb v. Commonwealth*, 276 Ky. 362, 124 S.W.2d 486, 489 (1939).

Another case involving a fatal automobile accident gave this court occasion to speak on voluntary manslaughter and unintentional conduct. The court said:

"It is our view that instructions in voluntary manslaughter cases should require a finding of reckless and wanton conduct, and instructions in involuntary man-

slaughter cases should require a finding of gross negligence in order to authorize a conviction." *Marye v. Commonwealth*, Ky., 240 S.W.2d 852, 855 (1951).

Prior to 1962, Kentucky recognized three homicide offenses: murder, voluntary manslaughter, and involuntary manslaughter. The first two applied to intentional homicides; the third covered unintentional homicides. But this court began to accept the idea that the crime of voluntary manslaughter could be committed by an unintentional homicide. See *Jones v. Commonwealth*, supra.

"Then in 1962 the Kentucky legislature created the statutory offenses of involuntary manslaughter in the first and second degrees, using the term 'wantonness' to describe the former and 'recklessness' to describe the latter. Following the creation of these offenses, the Court of Appeals ruled that the crime of voluntary manslaughter could no longer be used to impose punitive sanctions upon an individual who had 'unintentionally' caused the death of another. Homicides resulting from 'wanton or reckless' conduct, after this decision, had to be prosecuted under the involuntary manslaughter statute . . . ." [1]

The facts in this case demonstrate that the accident was not the typical automobile accident where a driver makes a gross error of judgment and is tried for manslaughter or reckless homicide. Rather, Hamilton's conduct surpasses the usual vehicle manslaughter case and demonstrates "wanton" conduct and extreme indifference to human life. The jury was instructed on murder, second degree manslaughter and reckless homicide. It found that Hamilton should have known of the plain and obvious likelihood that death or great bodily injury could have resulted from operating his truck, while in a drunken condition, through an intersection where a red light demanded that he stop.

This is a "hurry-up" world of people on the go, with heavy traffic by high-pow-

1. Lawson, Robert G., *Kentucky Law Journal*, vol. 58, p. 250, (1969-70).

ered vehicles on all types of roads and at all times of the day or night. Such a situation coupled with a driver's inclination to take "one or more [drinks] for the road," increases the vehicular death rate on the highways of this Commonwealth. A majority of the members of this court is of the opinion that the legislature enacted KRS 507.020(1)(b) to deter such conduct. The legislature is commended for taking a giant step forward. Its action in enacting this statute will do much to decrease vehicular highway deaths by persons operating an automobile while under the influence of intoxicants.

The judgment is affirmed.

All concur except PALMORE, C. J., who files a dissenting opinion.

CLAYTON and LUKOWSKY, JJ., join in the dissent.

PALMORE, Chief Justice, dissenting.

I dissent from the majority opinion because I do not believe that either the drafters of the Kentucky Penal Code or the members of the General Assembly that enacted it had any intention of placing the reckless act of an automobile driver, whether drunk or sober, in the same category as that of a deliberate murderer. I concede that fatal carelessness in the operation of a motor vehicle calls for stern punishment, but murder is something else. There simply is a difference in culpability between committing an act that endangers people whose presence is known and an act that endangers people whose presence *should be* anticipated but *in fact* is not known. The quotation from Holmes in the majority opinion is misplaced. Certainly "a case could be made where the riding was so manifestly dangerous that it would be murder," but in keeping with his illustration of exploding a barrel of gunpowder in a crowded street, that would be the case in which the guilty party rode or drove heedlessly into a person or persons known to be in his path or so near to it that he must have realized he would hit somebody. I have read a great deal of Holmes in my time. I suppose, indeed, that he has been my idol as a judicial philosopher. I am inclined to believe the decision in this case would give him an acute attack of gastritis.

I am authorized to state that CLAYTON and LUKOWSKY, JJ., join in this dissenting opinion.