[No. 16359-8-III. Division Three. January 12, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES BENJAMIN BARSTAD, *Appellant*.

---

554

*Brian C. O'Brien* of *Dorn & O'Brien, P.S.*; and *Matthew P. Arpin*, for appellant.

*Steven J. Tucker, Prosecuting Attorney*, and *Larry D. Steinmetz, Deputy*, for respondent.

KURTZ, J. — James B. Barstad killed two young women when he sped through a red light at a busy intersection in Spokane on the evening of May 25, 1996. Other motorists testified that in the moments before the fatal collisions, they witnessed him drive over the lawn of a private business, run another red light, and gesture angrily at them.

Mr. Barstad explained his driving was affected by the emotional state produced by the large amount of alcohol he consumed that day and a fight with a girl friend. The State charged Mr. Barstad with two counts of first degree murder under the part of the statute that punishes conduct manifesting an "extreme indifference" to human life that results in another's death. RCW 9A.32.030(1)(b). The jury convicted him.

In his appeal, Mr. Barstad contends the vehicular homicide statute supersedes the murder statute in circumstances in which the defendant causes the death of another through reckless or drunken driving. Alternatively, he contends the court's instructions that set forth the essential elements of "extreme indifference" murder did not advise the jury of the requisite mens rea for the offense. We affirm Mr. Barstad's convictions.

## FACTS

On May 25, 1996, James Barstad was in Spokane visiting his girl friend. He testified they were fighting, and he drank heavily that afternoon. He consumed two to four shots of alcohol in drinks at a restaurant; and later, most of two 48-ounce pitchers of beer at a tavern. They returned to his girl friend's apartment on Upriver Drive around 7:00 P.M., but she soon asked him to leave. He got in his truck and headed toward Mission Park. According to Mr. Barstad, he intended to sleep in the park until the effects of the alcohol dissipated.

Susan and Jeff Ward were driving along North Crescent Drive, when they saw Mr. Barstad walking back and forth in the road ahead of them. His truck was stopped on the side of the road. Mr. Barstad was shouting, and Mr. Ward slowed almost to a stop because he was afraid Mr. Barstad would walk into the path of his vehicle. Mr. Barstad got "something" out of his truck and charged at the Wards. Mrs. Ward told her husband, "just go." As Mr. Ward drove away, he looked in his rearview mirror and saw Mr. Barstad raise his arm in a gesture like he was shooting at them.

David Burgess testified he was driving north on Upriver Drive when he noticed a pickup truck driving south towards him at 40 to 50 miles per hour. Mr. Burgess stopped. The driver of the pickup applied his brakes hard, creating blue smoke from the friction on his tires. He grinned at Mr. Burgess when he went by him. Mr. Burgess watched him jump the curb, and head across the lawn and around a building to Mission Street.

Adam Phillips was driving west on Mission. In his rearview mirror, he saw Mr. Barstad cross the grass and emerge behind him. Alarmed, Mr. Phillips immediately turned right on the next street, and observed Mr. Barstad run a red light at Mission and Perry at 45 to 50 miles per hour. Mr. Phillips testified Mr. Barstad "flipped off" the other motorists.

Marvin Wheeler was driving west on Mission when he saw the light at the Hamilton Street intersection turn yellow. At that time, he was a half block from the intersection. He then heard an engine "rev up rather loud" behind him, and turned his head in time to see Mr. Barstad speed past him. Mr. Wheeler saw the pickup's brake lights come on for a second, but then the engine roared as Mr. Barstad accelerated again. Mr. Wheeler estimated Mr. Barstad entered the intersection at 55 to 60 miles per hour.

Mr. Wheeler saw Mr. Barstad collide first with a car northbound on Hamilton, then with a southbound car. The truck became airborne before landing on top of a third vehicle. Fourteen-year-old Julie Allen, a passenger in the southbound vehicle, died as did Karen Sederholm, the driver of the vehicle on which Mr. Barstad's truck landed. Mr. Barstad later testified he knew he was going too fast to stop for the red light. He accelerated because he thought he could get through the intersection before north-south traffic entered it.

Several of the witnesses at Mr. Barstad's trial testified about his conduct after the collisions. Mr. Phillips stated Mr. Barstad was sitting on his truck, crying, and "being very, very hostile." He smelled of alcohol and was telling

people, "get away from my truck." Mr. Wheeler thought Mr. Barstad was intoxicated, but not "falling down drunk." Shelly Tombari said Mr. Barstad was wandering around, yelling, and raising his fists at people. Richelle Goettel, a nursing student, came to his aid. He said, "Wow, I did it . . . . Poor suckers; shoulda not been in my way, shoulda been able to see me coming, hell, shoulda been able to hear me. It's not my fault." When she asked if he was okay, he responded, "Well, f[ ] you[.]" As Ms. Goettel left him to help the other victims, she heard Mr. Barstad yell, "I don't know what you guys are making such a big deal out of this for. . . . [T]hey're not all that hurt." The spectators jeered, and Mr. Barstad raised his fist at a 16-year-old boy who was injured in the second vehicle he hit. He yelled, "But I can still make it worse than this[.]" Ms. Goettel inferred he intended to hit the boy.

Police Officer Robert Boothe contacted Mr. Barstad at the scene. Mr. Barstad was seated on the curb with an angry crowd around him. Officer Boothe conducted field sobriety tests on Mr. Barstad, and concluded he was intoxicated. He asked Mr. Barstad whether he believed his ability to drive was affected by his alcohol consumption. Mr. Barstad answered "No," but that his emotional state was. Another police officer at the scene testified that Mr. Barstad did not appear to have any difficulty answering questions.

According to Officer Boothe, Mr. Barstad showed no sign of remorse until later, when he transported him to the hospital for treatment. At that time, Officer Boothe told him that two people had died. Officer Boothe obtained two vials of blood from Mr. Barstad; later testing established his blood-alcohol level at .16. George Lindholm, the pathologist, stated a person with that level of alcohol can still recognize the dangers of operating a vehicle.

Corporal Harry Kennedy of the Spokane Police Department testified about the timing of the traffic light at the Mission/Hamilton intersection. Various witnesses estimated the light was red for 2 to 5 seconds before Mr. Barstad

entered the intersection. Corporal Kennedy also testified there were no skid marks at the intersection to indicate Mr. Barstad tried to stop.

Police officers at the scene searched Mr. Barstad's truck and found a fanny pack with four one-ounce baggies of a substance later tested and found to contain methamphetamine. Based on that evidence, the State also charged Mr. Barstad with possession of a controlled substance with intent to deliver. Police Officer Michael Yates testified that each ounce of methamphetamine contains 28 grams and that a standard hit is one-tenth of a gram and sells for approximately $15 to $30. However, Arnold Melnikoff, a forensic scientist, admitted the baggies did not contain 100 percent methamphetamine. Rather, the contents were mixtures of 10 percent methamphetamine, 40 to 50 percent nicotinamide, 30 percent amphetamine, and lesser amounts of other ingredients.

At the beginning of trial and again at the close of the State's case, Mr. Barstad moved to dismiss the murder charges. He argued that vehicular homicide and murder by extreme indifference are concurrent offenses. He, therefore, reasoned that in cases involving a motor vehicle death, the State can charge only under the more specific vehicular homicide statute. The court denied the motions.

The court also denied Mr. Barstad's motion to dismiss the charge of possession of methamphetamine with intent to deliver. In doing so, the court rejected his argument that the amount of methamphetamine in the mixture seized was too small to establish an intent on his part to deliver the mixture to any other person.

The jury convicted Mr. Barstad of all charges. He appeals.

## ANALYSIS

Did the court err in instructing the jury on the charge of first degree murder by extreme indifference?

There are two questions. First, does the vehicular homi-

cide statute supersede application of the first degree "extreme indifference" murder statute in situations involving a death that is a result of drunk driving? Second, do rules of statutory construction and the legislative history for the "extreme indifference" murder statute, indicate the Legislature did not intend it to apply in situations in which a homicide results from the actor driving a motor vehicle?

Mr. Barstad argues when a general and subservient special statute relate to the same subject, the provisions of the specific statute prevail. For instance, he notes the negligent homicide statute supersedes the general manslaughter statute. *State v. Collins*, 55 Wn.2d 469, 470, 348 P.2d 214 (1960). Mr. Barstad further asserts the legislative intent here was that extreme indifference murder would not apply to vehicular homicide cases. He relies upon RCW 9A.32.020(2), which states that nothing contained in the homicide statute shall affect the vehicular homicide statute, RCW 46.61.520. Additionally, Mr. Barstad argues the fact the Legislature recently made vehicular homicide a class A felony reflects its intent to include even the most egregious circumstances in the vehicular homicide statute.

*Concurrent Statutes.*

"[W]here a general and subsequent special statute relates to the same subject, the provisions of the latter must prevail." *Collins*, 55 Wn.2d at 470. *Collins* held "in all cases where the negligent homicide statute is applicable, it supersedes the manslaughter statute." *Id*. Otherwise, the prosecutor would have the unfettered discretion "to elect, from person to person committing this offense, which degree of proof shall apply to his particular case." *Id*. The court based its holding on the fact "proof which would sustain a charge of manslaughter would not be sufficient" in a negligent homicide case because "manslaughter requires proof of only ordinary negligence . . . while negligent homicide requires proof of more than ordinary negligence." *Id*. (citations omitted).

Mr. Barstad believes we should extend *Collins* to the present situation and hold the vehicular homicide statute

also prevails over the first degree murder statute. However, there is a fine but material distinction between *Collins* and this case. The prosecutor in *Collins* attempted to ease his proof requirement by charging under the general manslaughter statute rather than the specific vehicular homicide statute. *Collins* rightly held that such charging discretion violated the defendant's right to equal protection. Here, the more culpable mens rea is that required in the general statute—extreme indifference murder. By choosing to charge first degree murder, a prosecutor does not ease the proof requirements; he increases it.

As the State points out, the rule applicable here is stated in *In re Personal Restraint of Taylor*, 105 Wn.2d 67, 68, 711 P.2d 345 (1985): "[T]here is no equal protection violation when the crimes the prosecutor has the discretion to charge require proof of different elements." In *Taylor*, the State charged the defendant with first degree theft, a felony, instead of a violation of RCW 50.36.010, which makes it a misdemeanor to knowingly give false information to obtain benefits under the Employment Security Act. The court held the theft charge was appropriate because three of the four elements of first degree theft were unnecessary to sustain a conviction under RCW 50.36.010.

■ Here, RCW 9A.32.030(1)(b) provides that a person is guilty of murder in the first degree when "[u]nder circumstances manifesting an extreme indifference to human life, he or she engages in conduct which creates a grave risk of death to any person, and thereby causes the death of a person." RCW 46.61.520(1) provides that a driver is guilty of vehicular homicide if he causes a death while operating a vehicle: "(a) While under the influence of intoxicating liquor . . .; or (b) In a reckless manner [i.e., disregarding a substantial risk a wrongful act may occur]; or (c) With disregard for the safety of others." The Supreme Court has held that conduct that occurs under circumstances "manifesting an extreme indifference to human life" requires a more culpable mens rea than recklessness or disregard for the safety of others. *State v. Dunbar*, 117 Wn.2d 587, 594,

817 P.2d 1360 (1991) ("The presence of the greater degree of risk elevates the level of recklessness to an extreme level, thus 'manifesting an extreme indifference to human life.' "). Hence, the State's decision to prosecute Mr. Barstad for first degree murder did not violate his right to equal protection because the murder statute required the State to prove elements different from those required under the vehicular homicide statute.

*Legislative Intent.*

Mr. Barstad next argues the above analysis is irrelevant because the "clear intent" of the Legislature was that the State would charge as vehicular homicide all motor vehicle deaths in which the driver acted with criminal culpability. He bases this argument on the record of the Senate Judiciary Committee meeting on January 16, 1975, which considered the language of the murder statute, and upon RCW 9A.32.020(2). RCW 9A.32.020(2) provides that "[n]othing contained in this chapter shall affect RCW 46.61.520 [the vehicular homicide statute]."

In the above-referenced Senate Judiciary Committee meeting, one of the senators expressed concern that the "ordinary" negligent homicide with an automobile would now come under the definition of "extreme indifference" murder. An "ordinary" negligent homicide was not defined by the senator. However, it is logical to conclude he was referring to deaths caused by reckless driving, drunken driving, or driving without regard for the safety of others, but without the aggravating factors present in this case.

■ ■ Indeed, the numerous jurisdictions that have applied "extreme indifference" murder statutes to defendants who caused a death while driving a motor vehicle, recognize that additional facts must be present. Specifically, the facts must evidence the defendant's subjective knowledge his act is extremely dangerous, and his indifference to the consequences. *See United States v. Fleming*, 739 F.2d 945 (4th Cir. 1984); *Slaughter v. State*, 424 So. 2d 1365 (Ala. Crim. App. 1982); *Pears v. State*, 698 P.2d 1198 (Alaska 1985); *People v. Watson*, 30 Cal. 3d 290, 637 P.2d 279, 179

Cal. Rptr. 43 (1981), *superseded by statute as stated in People v. Whitfield*, 15 Cal. Rptr. 2d 4 (Cal. Ct. App. 1992); *Powell v. United States*, 485 A.2d 596 (D.C. 1984); *Anderson v. State*, 254 Ga. 470, 330 S.E.2d 592 (1985); *Hamilton v. Commonwealth*, 560 S.W.2d 539 (Ky. 1977); *People v. Vasquez*, 129 Mich. App. 691, 341 N.W.2d 873 (1983); *State v. Omar-Muhammad*, 102 N.M. 274, 694 P.2d 922 (1985); *People v. Gomez*, 65 N.Y.2d 9, 478 N.E.2d 759, 489 N.Y.S.2d 156 (1985); *State v. Snyder*, 311 N.C. 391, 317 S.E.2d 394 (1984); *Smith v. State*, 674 P.2d 569 (Okla. Crim. App. 1984); *Commonwealth v. Taylor*, 461 Pa. 557, 337 A.2d 545 (1975); *Simmons v. State*, 264 S.C. 417, 215 S.E.2d 883 (1975); *State v. Moss*, 727 S.W.2d 229 (Tenn. 1986); *Wagner v. State*, 76 Wis. 2d 30, 250 N.W.2d 331 (1977).[1]

Nor are we persuaded that RCW 9A.32.020(2) supports Mr. Barstad's argument. That subsection provides that RCW 9A.32 does not affect the vehicular homicide statute. RCW 9A.32.020(2) is in accord with *Collins*, decided 15 years earlier, that in charging decisions in situations involving conduct that could otherwise be classified as manslaughter, the vehicular homicide statute will control. It

---

[1]According to Professor David Luria, the courts' analyses in these cases did not go beyond statutory language or well-worn definitions. The particular facts of each case were what illustrated the meaning of "depraved mind" or "extreme indifference to life." David Luria, *Death on the Highway: Reckless Driving as Murder*, 67 OR. L. REV. 799, 821-22 (1988). He reviewed 20 cases filed from 1975-1986 and identified the factors the courts relied upon to show the culpable intent. The factors he found were:

(1) Intoxication. Alcohol, illegal drugs, or both.

(2) Speeding at excessive rates.

(3) Near or nonfatal collisions shortly before the fatal accident. The courts believe the collisions should have served as warnings to the defendants that their conduct was likely to cause an accident.

(4) Driving on the wrong side of the road.

(5) Failure to aid the victim.

(6) Failure to heed traffic signs. Usually more than once before the fatal accident, the driver ran a red light and/or stop sign.

(7) Failure to heed warnings about reckless driving; e.g., a warning to a defendant not to drive because he was intoxicated.

(8) Prior record of driving offenses.

also reflects a legislative intent that the "ordinary" vehicular homicide does not fall within the scope of RCW 9A.32.

We hold the State did not violate Mr. Barstad's right to equal protection under the law because the charged offenses required it to prove a more culpable mens rea to convict. Nor has Mr. Barstad shown the Legislature intended to exclude from the extreme indifference murder statute all homicides resulting from the operation of a motor vehicle.

Did the court's instructions accurately instruct the jury on the law of extreme indifference murder?

*The Mens Rea Instructions.*

█ The court instructed the jury:

### INSTRUCTION NO. 10

To convict . . . the following elements of the crime must be proved beyond a reasonable doubt:

. . . .

(2) That the conduct of the defendant created a grave risk of death to another person;

(3) That the defendant engaged in that conduct under circumstances manifesting an extreme indifference to human life[.]

### INSTRUCTION NO. 11

A person engages in conduct manifesting an extreme indifference to human life when:

---

Luria, *supra*, at 823. The author concluded: "Even though the difference between murder and manslaughter is *a state of mind difficult to define in the abstract*, it is determinable by a careful consideration of the relevant facts of a particular case." Luria, *supra*, at 825 (emphasis added). *See also* H. C. Lind, Annotation, *Homicide by Automobile as Murder*, 21 A.L.R.3D 116 (1968 & Supp. 1997); Jeffrey F. Ghent, Annotation, *Validity and Construction of "Extreme Indifference" Murder Statute*, 7 A.L.R.5TH 758 (1992 & Supp. 1997).

In Mr. Barstad's case, factors 1, 2, 3, 5, 6, and 7 are present. These facts, viewed in the context of the instructions given by the court, evidence more than mere recklessness and differentiate this crime from both vehicular homicide and manslaughter.

1. He engages in conduct creating a grave risk of death to others; and

2. He knows of and disregards the grave risk of death to others; and

3. His conduct and disregard of such grave risk occurs under circumstances which manifest his extreme indifference to human life.

Mr. Barstad objected to the above instructions, arguing they omitted any intent requirement; i.e., that the defendant intended to commit an act placing the lives of others in jeopardy. He proposed Instruction No. 1, as follows: "A person manifests an extreme indifference to human life when he acts in a manner *calculated* to put the lives of many persons in jeopardy, *with full consciousness of the probable consequences.*"[2] (Emphasis added.) The court denied Mr. Barstad's objection and proposed instruction.

The court's instructions are correct statements of the requisite mens rea, as set forth in *State v. Dunbar*, 117 Wn.2d 587, 817 P.2d 1360 (1991). There, the court held that the State could not charge the defendant with *attempted* first degree murder by "extreme indifference." The court observed that "[w]here a crime is defined in terms of acts causing a particular result, a defendant charged with *attempt* [to commit that crime] must have specifically intended to accomplish that criminal result." *Id.* at 590 (emphasis added) (citing WAYNE R. LaFAVE & AUSTIN W. SCOTT, JR., CRIMINAL LAW § 6.2(c), at 500 (2d ed. 1986)). For the defendant to *attempt* first degree murder by extreme indifference, he has to intend the criminal result of death. *Dunbar*, 117 Wn.2d at 590-91. The court interpreted RCW 9A.32.030(1)(b) as requiring "an aggravated

---

[2]The quoted proposed instruction is taken from the written proposed instructions Mr. Barstad filed. We note that in his oral objection to the court, he stated the proposed instruction in slightly different language: "A person manifests an extreme indifference to human life when he intentionally commits an act which puts the lives of others in jeopardy, with knowledge of the probable consequences. It is not necessary that he intend that death result." The court did not err in refusing to give either version.

or extreme form of recklessness which sets the crime apart from first degree manslaughter." *Dunbar,* 117 Wn.2d at 594 (citing LaFave & Scott, *supra,* § 7.4(a), at 618). *Dunbar* concluded there can be no attempted murder by "extreme indifference" because the mens rea element of that offense does *not* require the defendant to intend to accomplish the criminal result of death. *Dunbar,* 117 Wn.2d at 592-93. *See also State v. Chhom,* 128 Wn.2d 739, 742, 911 P.2d 1014 (1996).

■ In any event, we conclude the court's instructions permitted Mr. Barstad to argue his theory of the case, as set forth in the proposed elements instruction offered by the defense. That instruction would have advised the jury the State had to show he purposefully engaged in conduct, calculated to create a grave risk of death. Counsel stated in closing argument: "[W]ith . . . first degree murder, the State has to convince you beyond a reasonable doubt as to what was going through Mr. Barstad's mind. . . . [T]he State has to show that Mr. Barstad . . . knowingly went through the intersection and caused the collision." Further, "that he did that knowing that going through the intersection causing the collision created a grave risk of death, and they have to show that he did that under circumstances manifesting extreme indifference to human life." Stated differently, the State had to prove "there was a decision made to do that, and it wasn't made for any good purpose. It was made with the thought in mind, 'I don't care if I kill people.'"

*Failure to Define "Extreme Indifference."*

Mr. Barstad argues that the court's Instruction No. 11, quoted above, did not adequately define the phrase "conduct manifesting an extreme indifference to human life." He asserts that instruction describes a mens rea no different from that required of first degree manslaughter. First degree manslaughter occurs when a defendant "recklessly causes the death of another person." RCW 9A.32.060(1)(a). Under RCW 9A.08.010(1)(c), "[a] person . . . acts recklessly when he knows of and disregards a substantial risk

that a wrongful act may occur and his disregard of such substantial risk is a gross deviation from conduct that a reasonable man would exercise in the same situation."

The mens rea for first degree manslaughter is different in one very apparent aspect. It requires only a knowing disregard of "a *substantial* risk that a *wrongful act* may occur." RCW 9A.08.010(1)(c) (emphasis added). First degree murder by extreme indifference requires a knowing disregard of a *grave* risk of *death* to others. And, the defendant's conduct and knowing disregard of such grave risk must occur in circumstances which manifest an extreme indifference to human life.

■ The question then is whether further definition is required of the phrase "circumstances manifesting an extreme indifference to human life." The general rule is that "[t]rial courts must define technical words and expressions used in jury instructions, but need not define words and expressions that are of ordinary understanding or self-explanatory." *State v. Brown*, 132 Wn.2d 529, 611-12, 940 P.2d 546 (1997), *cert. denied*, 523 U.S. 1007 (1998). As noted by the court in *Dunbar*, 117 Wn.2d at 593, legislative history indicates the Legislature substituted the term "extreme indifference" for the antiquated "evincing a depraved mind" terminology of the prior law for the purpose of updating the code with modern language. According to Professor Luria, *supra* note 1, at 821-22, the courts have not attempted to further define "extreme indifference"; rather, the particular facts of each case are what illustrate its meaning. There is no need for further definition.

Here, Mr. Barstad's level of intoxication, his excessive speed, the fact he had run a red light and confronted other motorists even before he reached the Mission/Hamilton intersection, and his expressed contempt for the injuries he caused, give meaning to the term "extreme indifference" in this case.

*Impermissible Inference—Instruction No. 13.*

The court instructed the jury:

## INSTRUCTION NO. 13

You may infer that the defendant had an extreme indifference to human life if you find that the evidence of the defendant's conduct supports such an inference. However, any inference drawn from such evidence is not binding upon you and may be rebutted by other evidence including evidence of the defendant's mental state.

Mr. Barstad complains the instruction permitted the jury to find the requisite mens rea from his conduct alone without any evidence of his mental state.

 Mr. Barstad's complaint reflects his misunderstanding of the mens rea of this offense. It is not required that the offender intended to commit the offense. He need only know of and disregard the fact his conduct presents a grave risk of death to others, as evidenced by circumstances that manifest his extreme indifference to human life. The State may rely upon reasonable inferences drawn from the evidence. *State v. Deal*, 128 Wn.2d 693, 699, 911 P.2d 996 (1996). In this case, a reasonable inference from Mr. Barstad's conduct is that he had the requisite mens rea. Instruction No. 13 was proper.

We hold the court's instructions are correct statements of the law of extreme indifference murder. The court did not err when it overruled Mr. Barstad's objections to them and denied the proposed instructions.

Only the foregoing portion of this opinion will be printed in the Washington Appellate Reports. The remainder of the opinion having no precedential value shall be filed for public record pursuant to RCW 2.06.040.

SCHULTHEIS, C.J., and BROWN, J., concur.

Review denied at 137 Wn.2d 1037 (1999).