# IMPORTANT NOTICE
# NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: MARCH 23, 2017
NOT TO BE PUBLISHED

# Supreme Court of Kentucky FINAL

2016-SC-000103-MR

DATE 8/24/17 Kim Redmon, DC

JUSTIN D. WIBBELS                                                APPELLANT

V.
         ON APPEAL FROM LAUREL CIRCUIT COURT
         HONORABLE GREGORY ALLEN LAY, JUDGE.
                  NO. 14-CR-00287

COMMONWEALTH OF KENTUCKY                         APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

A jury in Laurel County convicted Justin Wibbels of wanton murder. Consistent with the jury's sentencing recommendations, the trial court fixed his sentence at confinement for twenty years.

Wibbels now appeals as a matter of right, Kentucky Constitution § 110(2)(b), arguing that the trial court erred by: (1) denying his motion for a directed verdict; and (2) denying his request to introduce evidence of the victim's family's ill will toward him. For the reasons set forth below, we affirm.

### I. BACKGROUND[1]

On the morning of June 16, 2014, the Appellant, Justin Wibbels, was traveling westbound in Laurel County on KY 30, a two-lane road with an emergency lane on each side. As he traveled in his extended cab pick-up

---

[1] Because Wibbels challenges the trial court's denial of his motion for directed verdict, we present the facts in a light most favorable to the Commonwealth unless otherwise noted.

truck, he approached and attempted to pass Laura Jones.[2] However, upon Wibbels initiating his pass, Jones was forced to pass the vehicle in front of her, which had unexpectedly pulled out into her path at a much slower speed from an intersecting side road. Jones passed the car and returned to her proper lane of travel in the westbound lane. Wibbels did not return to his proper lane. Instead, he moved to the left, into the eastbound emergency lane.[3]

Mark Sulfridge, a motorist driving westbound in front of Jones and Wibbels, testified that he observed Wibbels driving in the eastbound emergency lane as oncoming traffic passed him. Wibbels then moved from the eastbound emergency lane to the westbound lane behind Sulfridge. Sulfridge testified that he was traveling about sixty miles per hour, and Wibbels passed him "like [he] was sitting still." Wibbels overtook both Sulfridge and the vehicle in front of Sulfridge, as a line of five or six vehicles approached in the oncoming, eastbound lane. Sulfridge testified that, upon seeing the traffic approaching, he began to slow down so that Wibbels had space to re-enter the westbound lane. Sulfridge also testified that Wibbels pulled into the eastbound lane to pass Sulfridge, the vehicle in front him, and the vehicle in front of that. However, instead of re-entering the westbound lane, Wibbels, without slowing down, moved into the eastbound emergency lane for a second time.

_____

[2] We note, at the outset, that the entire course of events took place in a passing zone.

[3] Wibbels testified that he was "boxed in" by Jones, the slower moving vehicle he was attempting to pass, and additional vehicles that had taken his place in traffic behind the slower moving vehicle. Thus, he contends he was forced into the eastbound emergency lane.

2

James Belt was just approaching KY 30 from an intersecting road to the south (to Wibbels's left while he drove in the eastbound emergency lane).[4] Belt testified that, as he sat at the stop sign, preparing to turn into the eastbound lane of KY 30, he looked right and saw Wibbels approaching rapidly. Belt testified that Wibbels's truck "came through so fast it shook [his] truck" and "rocked it from side to side." Belt also testified that, when Wibbels passed him, there were no vehicles directly next to Wibbels, which would have prevented Wibbels from returning to the westbound lane of traffic.[5] Belt pulled into the eastbound lane and, through his rearview mirror, observed Wibbels move into the eastbound lane and then back into the eastbound emergency lane, while continuing westbound. Belt testified that Wibbels could have moved into the open westbound lane but returned to the eastbound emergency lane.

As Wibbels drove in the eastbound emergency lane, Timothy Berry was traveling westbound on KY 30 ahead of Wibbels and Sulfridge. Through his rearview mirror, Berry could see Wibbels driving westbound in the eastbound emergency lane as oncoming traffic passed Wibbels. Berry testified that he was traveling at fifty-five miles per hour, with a line of four or five cars behind him, and Wibbels was "catching [up to him] like [he] was sitting still." About this time, a new line of four or five vehicles appeared around a curve, traveling in the eastbound lane. Berry testified that he moved over to the right, partially in

---

[4] The road Belt was exiting, Freeman Hollow Road, was approximately a quarter of a mile from where Wibbels first passed Jones.

[5] Wibbels disputed this testimony, contending that he was not able to return to the westbound lane because of a stream of cars therein.

3

the westbound emergency lane, to allow Wibbels to return to the westbound lane, but Wibbels remained in the eastbound emergency lane.

The first vehicle in the line of oncoming vehicles passed Wibbels. However, the second vehicle, a utility van driven by the victim, Jerry Thompson, suddenly darted into the eastbound emergency lane. No evidence was presented establishing why Thompson moved abruptly into the emergency lane. The two vehicles collided in the grassy area to the side of the eastbound emergency lane, killing Thompson instantly.

Berry testified that the collision occurred just opposite his vehicle and that, upon seeing the collision, he returned to the scene to check on the drivers. Berry asked Wibbels why he was passing in the emergency lane, to which Wibbels replied that he was "late and in a hurry." Wibbels testified that he never made this reply to Berry. He stated that he had to be at work by 9:00 A.M. and he was not running late, evidenced by the fact that, although it took him thirty to forty minutes to travel from his home to work, it was only 8:00 A.M. at the time of the collision.

Wibbels was subsequently convicted by a Laurel County jury of wanton murder, and was sentenced to twenty years' imprisonment. This appeal followed. We set forth additional facts as necessary below.

## II. STANDARD OF REVIEW

Because the issues presented require us to apply different standards of review, we set forth the appropriate standard as necessary when addressing each issue.

4

## III. ANALYSIS

### A. The trial court properly denied Wibbels's motion for a directed verdict.

Wibbels contends that, because the Commonwealth failed to prove wanton murder, he was entitled to a directed verdict. We note that Wibbels properly preserved this challenge through his motions for a directed verdict at the close of the Commonwealth's case-in-chief and at the close of his own case-in-chief. Because we discern that there was sufficient evidence for a reasonable juror to find Wibbels guilty of each element, we affirm the trial court's decision to deny Wibbels's motions for a directed verdict.

On a motion for a directed verdict of acquittal, the trial court must draw all fair and reasonable inferences in the Commonwealth's favor. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). In ruling on the motion, "the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony." *Id.* "On appellate review, we determine whether, under the evidence viewed as a whole, it would be clearly unreasonable for a jury to find the defendant guilty." *Brown v. Commonwealth*, 174 S.W.3d 421, 424 (Ky. 2005).

In order to convict Wibbels of wanton murder, the Commonwealth must have proven that he "operat[ed] . . . a motor vehicle under circumstances manifesting extreme indifference to human life, [and] . . . wantonly engage[d] in conduct which create[d] a grave risk of death to another person and thereby

5

cause[d] the death of another person." Kentucky Revised Statute (KRS) 507.020(1)(b).

> A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

KRS 501.020(3). As we noted in *Brown v. Commonwealth*, "to be convicted of wanton murder under KRS 507.020(1)(b), Appellant must have had a more egregious mental state than mere wantonness." 174 S.W.3d 421, 425 (Ky. 2005). "It is the element of 'extreme indifference to human life' that elevates wanton homicide to the same level of culpability as intentional homicide." *Id.*

> There is a kind of [wanton] homicide that cannot fairly be distinguished . . . from homicides committed [intentionally]. [Wantonness] . . . presupposes an awareness of the creation of substantial homicidal risk, a risk too great to be deemed justifiable by any valid purpose that the actor's conduct serves. Since risk, however, is a matter of degree and the motives for risk creation may be infinite in variation, some formula is needed to identify the case where [wantonness] should be assimilated to [intention]. The conception that the draft employs is that of extreme indifference to the value of human life. The significance of [intention] is that . . . it demonstrates precisely such indifference.

KRS 507.020 (1974 cmt.) quoting Model Penal Code § 201.2 cmt. 2 (Tentative Draft No. 9, 1959)). Importantly, *"whether [wantonness] is so extreme that it demonstrates similar indifference is not a question that, in our view, can be further clarified; it must be left directly to the trier of facts."* *Id.* (emphasis added).

6

In our analysis, we examine whether the Commonwealth failed to present sufficient evidence to meet the requisite level of wantonness required to convict Wibbels of murder. The Commonwealth presented evidence that Wibbels was (1) driving at a high rate of speed (estimated at above eighty miles per hour); (2) passing back and forth between the opposite lane of travel and the opposite lane's emergency lane; and (3) in the vicinity of clusters of vehicles going both directions during their morning commute. Wibbels argues that his conduct was based on a social utility, in that he was precluded from returning to the proper of lane of traffic; however, the Commonwealth presented testimony from multiple witnesses who disputed his assertion. Furthermore, while in the emergency lane, Wibbels could have simply stopped and waited for the traffic to clear.

As noted above, we must view the evidence in the light most favorable to the Commonwealth when reviewing a court's decision to deny a motion for a directed verdict; in doing so, we discern that the court properly denied Wibbels's motion. A reasonable juror could find, based on the Commonwealth's evidence, that Wibbels's conduct manifested an extreme indifference to human life.

In the time since the General Assembly enacted Kentucky's modern Penal Code, we have visited the issue of wanton murder while operating a motor vehicle on many occasions. Our sentinel case, *Hamilton v. Commonwealth*, 560 S.W.2d 539 (Ky. 1977), affirmed the conviction of wanton murder where the defendant was drunk, speeding, and driving in the turn lane,

7

before he ran a red light, broad-siding another vehicle and killing its driver. As Wibbels correctly notes, the majority of our cases involve not just a violation of traffic laws, but also the use of intoxicants.[6] In each of these cases, we have held that there was sufficient evidence presented at trial to support a conviction of wanton murder.

Additionally, this Court has twice affirmed wanton murder convictions involving unintentional vehicular homicides in the absence of an intoxicated driver. In *Graves v. Commonwealth*, the defendant, in an effort to recover drugs for which he had just paid, raced through urban streets at over one hundred miles per hour while exchanging gunfire with the occupant of another vehicle. 17 S.W.3d 858, 863 (Ky. 2000). He then ran a red light and struck a vehicle proceeding through the intersection, killing the driver. *Id.* In *Brown v. Commonwealth*, the defendant was racing another vehicle; was distracted by dash-mounted television monitors in his vehicle; and ran a red light, before

---

[6] *See Walden v. Commonwealth*, 805 S.W.2d 102 (Ky. 1991) (defendant was speeding and had a .0297 blood alcohol level); *Keller v. Commonwealth*, 719 S.W.2d 5 (Ky. 1986) (defendant was drunk, speeding, and on the wrong side of the road); *Renfro v. Commonwealth*, 893 S.W.2d 795 (Ky. 1995), overruled on other grounds (defendant was drunk, speeding, on the wrong side of the road, and ran a red light); *Estep v. Commonwealth*, 957 S.W.2d 191 (Ky. 1997) (defendant was under the influence of five different medications, speeding, and passing in a no-passing zone near a curve in a two-lane highway); *Love v. Commonwealth*, 55 S.W.3d 816 (Ky. 2001) (defendant was drunk, speeding, and, upon seeing a police vehicle blocking the road, attempted to pass the police vehicle); *Berryman v. Commonwealth*, 237 S.W.3d 175 (Ky. 2007) (defendant had trace amounts of Xanax in his system, was speeding, and was looking at a package of prescription pills in his passenger's lap); and *Sluss v. Commonwealth*, 381 S.W.3d 215 (Ky. 2012) (defendant was under the influence of four medications, admitted using marijuana earlier in the day, was driving against the advice of the doctor who prescribed the medication, and was passing vehicles in a no-passing zone). In addition, this Court has rendered a plethora of unpublished opinions affirming similar cases.

8

striking a vehicle proceeding through the intersection, killing the driver. 174 S.W.3d 421 (Ky. 2005).

Wibbels contends that the above-noted caselaw indicates that a conviction of wanton murder involving unintentional vehicular homicides requires some form of aggravating conduct, such as intoxication, gun-fighting, gross inattentiveness, or racing. We noted in *Brown* that

> [t]he Commentary to KRS 507.020 is instructive as to what type of conduct might constitute aggravated wantonness: "Typical of conduct contemplated for inclusion in 'wanton' murder is: shooting into a crowd, an occupied building or an occupied automobile; placing a time bomb in a public place; or derailing a speeding locomotive." KRS 507.020(1974 cmt.).

*Id.* at 426. "Each of these examples involves an activity that poses a high risk to human life, undertaking in or directed toward a place where human beings are present; yet none of them requires intoxication." *Id.* Furthermore, none of them require anything more than the following:

> (i) homicidal risk that is exceptionally high; (ii) circumstances known to the actor that clearly show awareness of the magnitude of the risk; and (iii) minimal or non-existent social utility in the conduct. Such conduct plainly reflects more than mere awareness and conscious disregard of a substantial and unjustifiable risk of death. It manifests a high disregard for life and evinces what the common law chose to call a depravity of mind or heart.

*Brown*, 975 S.W.2d at 924 (quoting Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law*, § 8-2(c)(2), at 322 (1998)).

The homicidal risk of driving back and forth between oncoming traffic and the oncoming traffic's emergency lane is extremely high. While drivers are permitted to momentarily use the oncoming lane to overtake a slower moving vehicle in front of them, passing in the oncoming traffic's emergency lane is

9

never permitted. In fact, the emergency lane is the one place on the road where a driver, confronted with a dangerous situation, seeks safety from the other lanes of travel. However, when the driver finds, rather than safety, another vehicle driving head-on toward it at an excessive rate of speed, the homicidal situation we find here is likely to occur.

Wibbels contends that he was not aware of the risk of driving in the oncoming traffic's emergency lane. "The question of whether an actor knew or should have known the result he caused was rendered substantially more probable by his conduct is an issue of fact." KRS 501.060. The jury heard testimony that, upon approaching an intersecting road while in the emergency lane, he missed James Belt's vehicle by feet. The jury could certainly infer from this near-miss that Wibbels, if not aware prior to this near-miss, should have been aware that he could collide with another vehicle. The jury could also infer that, by traveling at speeds of more than eighty miles per hour, Wibbels should have been aware that any collision was likely to result in the death of another.

Wibbels argues that there was a social utility in his action: because he could not return to his proper lane of travel, and traffic was oncoming, he was forced to move to the oncoming emergency lane to avoid striking the other vehicles head-on. However, the jury heard that: 1) Wibbels darted back and forth more than once between the oncoming traffic lane and the oncoming emergency lane; 2) he had multiple opportunities to return to his proper lane of travel; 3) he did not decrease his speed but increased it to overtake additional

10

vehicles ahead of him; 4) he failed to come to a stop in the oncoming emergency lane, despite ample opportunity to do so; and 5) he stated to the first responder that he drove in the emergency lane because he was "late and in a hurry." Viewing this evidence in a light most favorable to the Commonwealth, a reasonable juror could find there was minimal, if any, social utility in his conduct.

We hold that it would not be clearly unreasonable for a jury to find Wibbels guilty of wanton murder. For the preceding reasons, we affirm the trial court's denial of Appellant's motion for a directed verdict.

**B.     The trial court did not abuse its discretion by excluding evidence of the Thompson family's ill will toward Wibbels.**

During his case-in-chief, Wibbels testified to being remorseful. On cross-examination, the Commonwealth asked Wibbels about his remorsefulness:

**Commonwealth:** You said you're remorseful.

**Wibbels:** Yes.

**Commonwealth:** Real bad. Mr. Thompson has three children, three grandchildren and a wife.

**Wibbels:** Yes.

**Commonwealth:** How many letters of remorse have you written them?

**Wibbels:** None.

**Commonwealth:** None. How many times have you picked up the phone and made a phone call and said, "I'm sorry"?

At this point, Wibbels objected. At the subsequent bench conference, Wibbels's counsel informed the trial court that it wished to introduce testimony

11

that there was considerable animosity between Wibbels and Thompson's family, and that members of Thompson's family had attempted to assault Wibbels outside the courtroom. Wibbels intended to offer this testimony to explain why he had not written letters or made phone calls to the victim's family. The trial court denied Wibbels's request to introduce testimony of the family's animosity toward him and directed the Commonwealth to proceed:

> **Commonwealth:** Mr. Wibbels, you ever pick up the phone and say, "I'm sorry he's not going to be there for Christmas or your birthday"?

> **Wibbels:** Excuse me?

> **Commonwealth:** Did you ever pick up the phone and call one of them and say, "I'm sorry he's not going to be there for your birthday. He's not going to be there for Christmas"?

> **Wibbels:** No, I have not done that.

During his redirect, Wibbels's counsel again requested that the trial court permit him to introduce testimony that, prior to trial, members of Thompson's family surrounded Wibbels's vehicle in the courthouse parking lot and "beat, threw things on the truck, used profanity, and threatened to kill him." The trial court, again, denied Wibbels's request. Wibbels then offered testimony by avowal that he did not send letters or make phone calls to Thompson's family because they had previously threatened him. Wibbels now contends that the trial court's refusal to allow him to present the subject-testimony was an abuse of the court's discretion.

The standard for reviewing questions of the admissibility of evidence is whether the trial court abused its discretion. *Johnson v. Commonwealth*, 105

12

S.W.3d 430, 438 (Ky. 2003). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.3d 941, 945 (Ky. 1999).

The trial court noted that the Commonwealth's line of questions regarding Wibbels's remorsefulness was proper because Wibbels had testified on direct that he was remorseful. Additionally, the trial court noted that Wibbels's requested testimony was more prejudicial than probative. Under Kentucky Rule of Evidence (KRE) 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, or needless presentation of cumulative evidence." KRE 403.

The Thompson family's ill will toward Wibbels was irrelevant because the trial did not concern their state of mind. In fact, during the guilt phase of the trial, only *Wibbels's* state of mind at the time of the accident was at issue. Whether Wibbels felt any remorse was an issue for the penalty phase. Thus, the Thompson family's ill will toward Wibbels did not have a tendency to make any material fact in the matter more or less probable. Additionally, Wibbels opened the door to that line of questioning when he testified to his

13

remorsefulness on direct examination. He cannot thereafter complain that the Commonwealth walked through that door. Finally, we note that the jury recommended the minimum sentence; therefore, evidence of Wibbels's remorse or lack thereof did not result in any discernable prejudice. As such, any error by the trial court was harmless.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the Laurel Circuit Court in this matter is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Stefan Bing
Gess Mattingly & Atchison, PSC

William Gary Crabtree
Crabtree & Goforth

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

David Bryan Abner
Assistant Attorney General

14