Aubrey NICHOLS, Movant,

v.

COMMONWEALTH of Kentucky,
Respondent.

Supreme Court of Kentucky.

June 15, 1983.

Rehearing Denied Nov. 2, 1983.

William M. Scalf, Lexington, for movant.

Steven L. Beshear, Atty. Gen., Carl Miller, Asst. Atty. Gen., Frankfort, for respondent.

VANCE, Justice.

Appellant was indicted for murder and his first trial resulted in a hung jury. On his second trial he was found guilty of second degree manslaughter and sentenced to confinement for ten years.

Appellant contends that he was entitled to a directed verdict on his first trial because the evidence was not sufficient to sustain a conviction, and therefore the double jeopardy provisions of the United States and the Kentucky Constitutions prevent his retrial.

█ A reversal of a judgment of conviction on appeal on the ground that no reasonable trier of fact could have found guilt on the basis of the evidence at trial precludes a retrial of the case because of prior jeopardy. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Commonwealth v. Burris,* Ky., 590 S.W.2d 878 (1979).

█ In some cases the declaration of a mistrial by a presiding judge when there was no manifest necessity to do so will prevent retrial. *United States v. Perez,* 22 U.S. (9 Wheat) 579, 6 L.Ed. 165 (1824). *Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963). Harassment of an accused by successive prosecutions or declaration of a mistrial so as to afford a more favorable opportunity to convict are examples of when jeopardy attaches. *Gori v. United States,* 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961). The granting of a mistrial because the jury is unable to agree is a classic example of when a retrial can be had, although the jury originally empaneled was discharged without reaching a verdict and without the defendant's consent. *Downum v. United States, supra.* There is no argument before us that the trial judge abused his discretion by discharging the jury.

Rather, appellant contends that because he was entitled to a directed verdict at the

first trial, he cannot be tried again. We have carefully reviewed the evidence at the first trial and hold that appellant was not entitled to a directed verdict of acquittal.

The motion for directed verdict, made at the close of the Commonwealth's case and again at the completion of all of the evidence, could not be sustained unless the evidence was such that a reasonable juror could not find guilt beyond a reasonable doubt under any theory of the case on the evidence presented. *Trowel v. Commonwealth,* Ky., 550 S.W.2d 530 (1977).

Evidence was presented at the original trial of an eyewitness who vacillated at trial but admitted that he testified before the grand jury as follows:

MR. COMBS continues reading: "So they was moving around and scuffling and I seen this gun and I said "Boys, Nick's got a gun over there." Phyllis was in the car with the door locked and the window rolled up.

Q. By Nick, do you mean Aubrey Nichols?

A. Yeah. Everybody calls him Nick. Sonny he just turned around and headed back in and Nick he just brings the gun up and holds it there just like that and shoots it. That's exactly what I saw.

Q. Where was she at?

A. She was in the car, the passenger's side.

Q. Did you hear any words between him or her or anyone else?

A. No, sir.

Q. You was across the street at another place?

A. I was across the parking lot.

Q. Too far to hear any words. You wouldn't have heard him if there were, would you?

A. If they had been talking loud or hollering I would.

Q. How close would you say you was to them?

A. I'd say 200 foot. I don't know.

Q. How many shots was fired?

A. Well, the only shot that I seen was the one he shot at the car at her. I seen

fire fly from the gun, and he had it aimed right at the car.

Q. What did you say? You said something about Sonny Spencer standing there with him.

A. Yeah, Sonny, evidently Sonny was trying to get him to not shoot her or something and he probably seen he couldn't stop it so he just turned around and headed back in the building, see.

Q. He headed back in the building?

A. Yeah, and he hadn't hit the door when he shot her.

Q. Do you think Spencer was probably already inside then?

A. He hadn't made it inside.

Q. But he was turned going into the door though?

A. Yeah, well, see, like this is the front of the building and this is the corner of the building. She was shot right in the corner of the building, so he had to come around the corner to go back in the club.

Q. He wouldn't have been in view of the shooting then?

A. No.

Did you say those things to the Grand Jury? Answer those questions?

A. Evidently I did.

MR. BURNS:

Your Honor, please, I move to strike and admonish the jury not to consider it for any purpose whatever.

THE COURT:

Overruled.

MR. BURNS:

I move to set aside the swearing of the jury and continue the case.

THE COURT:

Overruled. Continue.

Q. 27 Did you answer those questions in that manner to this grand jury?

A. Yes.

Q. 28 And you were under oath?

A. Yes.

Q. 29 I'll ask you again. Did you lie to the Perry County Grand Jury?

A. No.

Q. 30 Then is that your testimony? Is that what you saw that night on November 30, 1978?

A. I guess that's it.

Q. 31 Well now is it or isn't it? You started out here, Mr. Napier, telling us you didn't see anything, it was dark, and you have all this against Nick Nichols. Now I want this jury to know is what you told that Grand jury is it the truth or not the truth?

A. That's what I saw.

Although at trial this witness vacillated greatly in the tug of war between examination and cross-examination, he did state that his testimony before the grand jury was truthful and his credibility was for the jury. There was evidence that the appellant and the deceased were drinking heavily before the incident and that they were quarreling and cursing just before they left the bar and went to the parking lot where this shooting occurred.

A reasonable juror could have believed from the evidence that appellant deliberately fired a pistol into the automobile with intent to kill the deceased or that under circumstances manifesting extreme indifference to human life, he wantonly engaged in conduct which created a grave risk of death to another person and thereby caused the death of another person. K.R.S. 507.-020.

██ On a motion for directed verdict the evidence must be viewed in the light most favorable to the Commonwealth, and viewed from that standpoint the motion was properly overruled. It follows, therefore, that because evidence would have sustained a verdict of guilty had the jury agreed upon such a verdict, the inability of the jury to agree, either as to guilt or innocence, necessitated a mistrial, and a retrial was not precluded by a plea of former jeopardy. *Downum v. United States, supra.*

Appellant objected to the instruction on second degree manslaughter on the ground

that no evidence justified such an instruction. He reiterates here that his conviction of second degree manslaughter was unsupported by any evidence of wantonness.

The evidence at the second trial was stronger than the evidence at the original trial. Again, the jury was entitled to believe from the evidence that the appellant fired a pistol into an automobile in which the deceased was sitting. The jury was not required to believe appellant's version of the incident in which he claimed that the pistol accidently discharged while he and the deceased were struggling over it.

 The firing of a pistol into an occupied automobile which causes death of the occupant is murder if the jury is convinced that the shooting was done with the intent to cause the death. The firing of a pistol into an occupied car is also a wanton act and if the occupant is killed unintentionally, it is nevertheless murder if the jury is convinced that the person firing the pistol wantonly engaged in conduct which created a grave risk of death under circumstances manifesting extreme indifference to human life. K.R.S. 507.020(2).

A person is guilty of second degree manslaughter when he wantonly causes the death of another person. K.R.S. 507.040. The 1974 commentary to the penal code makes the following destinction between wanton murder and second degree manslaughter:

> When KRS 507.040 is read in conjunction with KRS 507.020(1)(b), it is clear that all deaths resulting from wanton conduct must constitute either murder or manslaughter in the second degree. It is also clear that once the elements of wantonness are shown to exist, the choice between the two offenses depends upon whether or not the defendant's conduct manifested "extreme indifference to human life." As indicated in the commentary to KRS 507.020, this distinguishing standard cannot be cited as an example of linguistic clarity. Yet it is used by

most of the modern penal codes and justified as follows:

> Whether [wantonness] is so extreme that it demonstrates similar indifference is not a question that, in our view, can be further clarified; it must be left directly to the trier of the facts. If [wantonness] exists but is not so extreme, the homicide is manslaughter .... Model Penal Code, § 201.2, Comment 2 (Tent.Draft No. 9, 1959).

Wanton conduct was defined in the instructions as follows:

> *Wantonly*—a defendant acts wantonly with respect to another's death when he is aware of and consciously disregards a substantial and unjustifiable risk that death will occur. In order to be "substantial and unjustifiable" the risk of death must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. [KRS 501.020(3)].

We cannot say as a matter of law that a reasonable juror could not believe beyond a reasonable doubt from the evidence presented that appellant wantonly caused the death of Phyllis Madden. Likewise, we do not consider the admission of testimony of Ronnie Freels, a ballistics expert, which was objected to by appellant, to be prejudicially erroneous.

The Judgment is affirmed.

All concur.