Demond T. BROWN, Appellant,

v.

COMMONWEALTH OF KENTUCKY,
Appellee.

Demond Brown, Appellant,

v.

Commonwealth of Kentucky, Appellee.

Nos. 2003–SC–0235–MR,
2003–SC–0716–TG.

Supreme Court of Kentucky.

June 16, 2005.

As Modified July 7, 2005.

Rehearing Denied Nov. 23, 2005.

Lisa Bridges Clare, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Todd D. Ferguson, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

COOPER, Justice.

On the night of January 15, 2002, in Hopkinsville, Kentucky, Appellant, Demond T. Brown, drove his Ford Crown Victoria automobile into an intersection against a red light and collided with another automobile operated by Debra Conklin and also occupied by Conklin's teenage daughter, Megan. Timothy Brown and Laticia Leavell, passengers in Appellant's vehicle, were injured as a result of the collision; Debra and Megan Conklin were killed. Appellant was subsequently convicted by a Christian Circuit Court jury of two counts of wanton murder, KRS 507.020(1)(b), and two counts of wanton endangerment in the first degree, KRS 508.060. He received sentences of twenty years imprisonment for each murder con-

viction and one year imprisonment for each wanton endangerment conviction, all to run concurrently for a total of twenty years. He appeals to this Court as a matter of right, Ky. Const. § 110(2)(b), asserting three claims of reversible error, *viz:* (1) denial of his motion for a directed verdict of acquittal on the wanton murder charges; (2) failure to grant him a new trial due to alleged juror misconduct; and (3) improper redirect examination and closing argument by the prosecutor. Finding no error, we affirm the judgment of the trial court.

## I. SUFFICIENCY OF THE EVIDENCE.

■■■■ On a motion for a directed verdict of acquittal, all fair and reasonable inferences are drawn in the Commonwealth's favor. *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991). On appellate review, we determine whether, under the evidence viewed as a whole, it would be clearly unreasonable for a jury to find the defendant guilty. *Commonwealth v. Sawhill,* 660 S.W.2d 3, 5 (Ky.1983). There was undisputed testimony establishing that, on the night in question, Appellant and his brother picked up Leavell from the Meritor factory when her work shift ended at approximately 10:00 p.m. Appellant had two television monitors mounted in his automobile, one on the automatic transmission gearshift, and the other in the passenger-side dashboard. Appellant left the Meritor factory, turned onto Pembroke Road, and traveled toward the point where Pembroke Road intersected with the Martin Luther King, Jr. Bypass, where the fatal crash took place. There was evidence from which the jury could infer that Appellant was driving at a rate of speed between five and fifteen miles per hour over the fifty-five miles per hour speed limit.

Michael Kaylor was also employed at the Meritor factory. He left the factory at the same time as Appellant, but in a separate vehicle. There was evidence at trial that Kaylor and Appellant briefly traveled side-by-side at a high rate of speed. The record also shows that Kaylor changed lanes upon approaching a Monte Carlo automobile from the rear, and continued traveling at a high rate of speed approximately one car-length behind Appellant's vehicle. Kaylor testified that he slowed his vehicle to turn off of Pembroke Road onto the Bypass immediately before the crash took place.

Adrian Thomas, the driver of the Monte Carlo, testified that the two cars passed by him "like [he] was sitting still." Kelvin Quick, Thomas's passenger, observed that one of the television monitors in Appellant's vehicle was in operation as the vehicle approached the intersection. Although Leavell and Timothy Brown both testified that the monitor was off when the collision occurred, they did not agree as to when it had been turned off. Based on Quick's testimony, the jury was entitled to infer that the monitor was on.

As Appellant approached the intersection, he saw that the traffic light in his direction was red. Nevertheless, he did not slacken his speed, believing that he could "time" the red light, *i.e.,* that the light would change in his favor before he entered the intersection. Appellant admitted and it is undisputed that the light was still red when he entered the intersection and that he never applied his brakes. Jennifer Kaeferle, who was waiting with her husband at the red light on the opposite side of the intersection, testified that her husband observed Appellant's vehicle and Conklin's vehicle approaching the intersection at the same time and remarked that a collision was about to occur. Kaylor, who was preparing to turn right somewhere

behind Appellant's vehicle, also testified that he saw the vehicles approaching each other and knew that a collision was imminent. There was no evidence adduced at trial indicating that either Appellant or his passengers ever saw the Conklin vehicle. The inference that Appellant did not see the impending collision was reinforced by the fact that his vehicle left no skid marks on the road prior to the point of impact.

Although Kaylor saw the accident occur, he immediately left the scene, drove home, changed vehicles, and then drove back to the scene of the accident. Kaylor testified that he never spoke to any officer at the scene. Based on the events of the night, Kaylor was charged with one count of wanton endangerment, and he entered an *Alford* plea[1] on the morning of Appellant's trial. The Commonwealth called Kaylor to testify during its case-in-chief and, during redirect examination, the prosecutor elicited testimony about the plea. On recross examination, Appellant's counsel asked Kaylor what he had done wrong. Kaylor responded, "As far as I was concerned, I didn't do anything wrong, but it got started somehow that I was racing, when I in fact wasn't."

"A person is guilty of murder when: ... (b) *Including, but not limited to, the operation of a motor vehicle under circumstances manifesting extreme indifference to human life,* he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person." KRS 507.020 (emphasis added). KRS 501.020(3) defines "wantonly," as follows:

A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense *when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur* or that the circumstance exists. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

(Emphasis added.)

 Of course, to be convicted of wanton murder under KRS 507.020(1)(b), Appellant must have had a more egregious mental state than mere wantonness.

As explained in the Commentary accompanying the Penal Code ... the culpable mental state defined in KRS 501.020 as wantonness ... without more, will suffice for a conviction of manslaughter in the second degree but not for murder because, to qualify as murder, a capital offense, it must be accompanied by further circumstances manifesting extreme indifference to human life.

*McGinnis v. Commonwealth,* 875 S.W.2d 518, 520 (Ky.1994) (internal citations and quotations omitted), *overruled on other grounds by Elliott v. Commonwealth,* 976 S.W.2d 416, 422 (Ky.1998). It is the element of "extreme indifference to human life" that elevates wanton homicide to the same level of culpability as intentional homicide.

"There is a kind of [wanton] homicide that cannot fairly be distinguished ... from homicides committed [intentionally]. [Wantonness] ... presupposes an awareness of the creation of substantial homicidal risk, a risk too great to be deemed justifiable by any valid purpose that the actor's conduct serves. Since

---

1. Referencing the Supreme Court's decision in *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), an "*Alford* plea" permits a defendant to maintain his innocence yet consent to the conviction and imposition of penalty. *Id.* at 36–37, 91 S.Ct. at 167.

risk, however, is a matter of degree and the motives for risk creation may be infinite in variation, some formula is needed to identify the case where [wantonness] should be assimilated to [intention]. The conception that the draft employs is that of extreme indifference to the value of human life. The significance of [intention] is that ... it demonstrates precisely such indifference. *Whether [wantonness] is so extreme that it demonstrates similar indifference is not a question that, in our view, can be further clarified; it must be left directly to the trier of facts.*"

KRS 507.020 (1974 cmt.) (quoting Model Penal Code § 201.2 cmt. 2 (Tentative Draft No. 9, 1959)) (emphasis added). *See also Nichols v. Commonwealth,* 657 S.W.2d 932, 935 (Ky.1983).

We have held that there was sufficient evidence to support a finding of this mental state, sometimes referred to as "aggravated wantonness," *Graves v. Commonwealth,* 17 S.W.3d 858, 863 (Ky.2000), in a number of cases involving unintentional vehicular homicides. In *Hamilton v. Commonwealth,* 560 S.W.2d 539 (Ky.1977), we held that the evidence was sufficient where the defendant, while under the influence of alcohol, drove his vehicle at a rate exceeding the speed limit and entered an intersection against a red light. *Id.* at 543. In *Walden v. Commonwealth,* 805 S.W.2d 102 (Ky.1991), *overruled on other grounds by Commonwealth v. Burge,* 947 S.W.2d 805, 811 (Ky.1996), we upheld a wanton murder conviction where the defendant lost control of his vehicle and crossed the center line while operating his vehicle while under the influence of alcohol and at a high rate of speed. *Id.* at 105. In *Estep v. Commonwealth,* 957 S.W.2d 191 (Ky.1997), we held that the evidence was sufficient where the defendant operated a motor vehicle at a high rate of speed after ingesting five different prescription drugs, one of which had debilitating effects of which she was aware, crossed the center line to pass another automobile in a no-passing zone, failed to return her vehicle to the proper lane, and caused a fatal collision. *Id.* at 193. In *Love v. Commonwealth,* 55 S.W.3d 816 (Ky.2001), we held the evidence sufficient where the defendant was speeding, was intoxicated, and did not slow down or attempt to stop upon seeing a police car blocking the road but attempted to swerve around the police car while traveling a reported seventy to ninety miles per hour. *Id.* at 827. In *Cook v. Commonwealth,* 129 S.W.3d 351 (Ky.2004), we held the evidence sufficient where the defendant was intoxicated, admitted he was aware of the risk of driving while intoxicated, and lost control of his vehicle while operating it at a high rate of speed because he wanted to show his passenger "what his car had." *Id.* at 362–63.

While the defendant in each of the preceding cases was impaired by an intoxicating substance, intoxication is not a prerequisite to a finding of extreme indifference to human life in a vehicular homicide case. The Commentary to KRS 507.020 is instructive as to what type of conduct might constitute aggravated wantonness: "Typical of conduct contemplated for inclusion in 'wanton' murder is: shooting into a crowd, an occupied building or an occupied automobile; placing a time bomb in a public place; or derailing a speeding locomotive." KRS 507.020 (1974 cmt.). Each of these examples involves an activity that poses a high risk to human life, undertaken in or directed toward a place where human beings are present; yet none of them requires intoxication. In other words:

Setting this conduct apart from behavior that would not warrant an unintentional murder conviction are the following

characteristics: (i) homicidal risk that is exceptionally high; (ii) circumstances known to the actor that clearly show awareness of the magnitude of the risk; and (iii) minimal or non-existent social utility in the conduct. Such conduct plainly reflects more than mere awareness and conscious disregard of a substantial and unjustifiable risk of death. It manifests a high disregard for life and evinces what the common law chose to call a depravity of mind or heart.

*Brown v. Commonwealth*, 975 S.W.2d 922, 924 (Ky.1998) (quoting Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law*, § 8–2(c)(2), at 322 (1998)).

The homicidal risk of entering an intersection against a red light at a high rate of speed is obviously high. Not every intersection is regulated by a red light. Presumably, such traffic control devices are installed at intersections where there is a high volume of traffic and for the purpose of preventing vehicles approaching from perpendicular directions from simultaneously entering the intersection and colliding. Appellant was aware of the magnitude of the risk. He admitted on cross-examination that he knew the light was red as he approached the intersection and that by entering the intersection against the red light, he disregarded the risk that another vehicle would be driving through the intersection at the same time. Appellant also admitted that he was aware of the risk that a resulting collision might kill the occupants of another vehicle. Finally, the social utility of Appellant's driving his vehicle into the intersection against the red light was nonexistent. He offered no excuse for his conduct. He was not, *e.g.*, rushing a dying person to a hospital.

"Extreme indifference to human life" is also an element of the offense of wanton endangerment in the first degree. KRS 508.060(1). We recently held in *Ramsey v.* *Commonwealth*, 157 S.W.3d 194 (Ky.2005), that a person acted under circumstances manifesting extreme indifference to human life by operating a motor vehicle while intoxicated with a passenger in the vehicle when, though he did not violate any statute other than KRS 189A.010(1), he also was observed accelerating away from a stop sign at a higher than normal rate of speed, and when signaled by a police officer to pull over, he turned off his lights before stopping. *Id.* at 198. Obviously, Appellant's conduct in this case exhibited a higher level of extreme indifference to the value of human life than that exhibited in *Ramsey*. Even if Appellant did not intend to run the red light, he was aware of and intentionally disregarded the risks that the light would not change in his favor before he entered the intersection, that if he ran the red light he might collide with another vehicle, and, if so, that persons might be killed.

Appellant points out that there was no evidence that he actually saw the Conklin vehicle as he approached the intersection. However, there was substantial evidence that the Conklin vehicle was readily visible to the other drivers on Pembroke Road, including Kaylor, and evidence from which the jury could infer that the reason Appellant failed to see it was because he was watching television instead of the approaching traffic.

Appellant argues that if this evidence is sufficient to support a wanton murder conviction, then every traffic violation will be converted into a charge of wanton endangerment, as any violation will necessarily involve extreme indifference to human life. We disagree. In *Johnson v. Commonwealth*, 885 S.W.2d 951 (Ky.1994), we held mere evidence that the defendant entered an intersection against a red light to be insufficient to support a wanton murder conviction. *Id.* at 953 ("Evidence was in-

troduced ... that he may have run a red light."). There was no other evidence of improper driving or conduct on the defendant's part. *Id. See also Commonwealth v. Mitchell*, 41 S.W.3d 434, 435 (Ky.2001) (mere failure to secure infant in child restraint system in violation of KRS 189.125(3) insufficient to support even a reckless homicide conviction). Appellant's conduct was substantially more than a mere traffic violation. In addition to driving at a rate exceeding the speed limit and violating a traffic signal, there was substantial evidence that Appellant was watching television rather than monitoring the traffic at the intersection and that he attempted to "time" the traffic light despite the fact that it remained red at all times during his approach. Moreover, from the testimony regarding the manner in which Appellant and Kaylor operated their vehicles and Kaylor's unusual conduct after the collision, the jury could reasonably have inferred that Appellant and Kaylor were racing during the period immediately preceding the collision and that Appellant ran the red light to "outrun" Kaylor, not realizing that Kaylor had slowed down to turn onto the Bypass. While the evidence was by no means overwhelming on these points, we cannot say as a matter of law that it was unreasonable for the jury to believe beyond a reasonable doubt that Appellant acted under circumstances manifesting extreme indifference to human life. *Nichols*, 657 S.W.2d at 935.

## II. ALLEGED JUROR MISCONDUCT.

■ Appellant claims the trial judge erred in overruling his motion for a new trial. The motion was premised upon allegations of juror misconduct supported by an affidavit sworn by Juror 25 and a newspaper article in the Louisville *Courier–Journal* quoting Jurors 4, 22, and 25. Appellant alleges that his rights to a fair trial and impartial jury were prejudiced when the jury improperly considered extrajudicial evidence during its deliberations, and when at least one juror withheld material information during voir dire. We review the trial court's denial of Appellant's new trial motion for abuse of discretion. *Jillson v. Commonwealth*, 461 S.W.2d 542, 545 (Ky.1970).

### A. Extrajudicial evidence.

■ In his affidavit, Juror 25 reported that another juror, whose name he did not recall, told the jury during deliberations that he had heard a rumor in the community that Appellant and Kaylor were racing as they approached the intersection of Pembroke Road and the Martin Luther King, Jr. Bypass. In the aforementioned newspaper article, Juror 22 questioned why Kaylor would have left the scene of the accident and later entered the *Alford* plea if he had been telling the truth about the racing allegations. The article also quoted Juror 4 as stating his belief that Kaylor and Appellant had been racing and Juror 25 reiterating his allegation that an unidentified juror had mentioned rumors of racing during deliberations. The trial judge held an evidentiary hearing at which Appellant was afforded the opportunity to present additional evidence of juror misconduct, but Appellant relied solely upon Juror 25's affidavit and the newspaper article.[2]

"A juror cannot be examined to establish a ground for a new trial, except to establish that the verdict was made by lot."

---

2. Hearsay is generally inadmissible as evidence in support of a motion for new trial. *See* KRE 1101(b) and (d); *Brown v. Commonwealth*, 490 S.W.2d 731, 732 (Ky.1973). Nevertheless, because the Commonwealth failed to object to the use of this evidence, we will address the merits of Appellant's claims.

RCr 10.04. We have adhered to the long-standing rule that juror testimony is generally incompetent to impeach a verdict. *See, e.g., Gall v. Commonwealth,* 702 S.W.2d 37, 44 (Ky.1985) (juror's testimony that jury improperly considered defendant's mental illness and parole eligibility during deliberations was incompetent); *Grace v. Commonwealth,* 459 S.W.2d 143 (Ky.1970) (juror's affidavit swearing that she did not agree to the verdict was incompetent); *Jones v. Commonwealth,* 450 S.W.2d 812, 814 (Ky.1970) (juror's affidavit swearing that jurors considered matters not in evidence during deliberations was incompetent).

In *Doan v. Brigano,* 237 F.3d 722 (6th Cir.2001), *abrogated on other grounds as recognized by Maples v. Stegall,* 340 F.3d 433 (6th Cir.2003), the United States Court of Appeals for the Sixth Circuit held an interpretation of Ohio Rule of Evidence 606(B) that precluded consideration of an affidavit attesting to improper *outside influence* on the jury to be contrary to clearly established United States Supreme Court precedent. *Id.* at 731. Appellant contends that Juror 25's affidavit and statements to the *Courier-Journal* demonstrate that his jury was subjected to such an outside influence. We disagree. Kaylor testified at trial, "it got started somehow that I was racing, which I wasn't. I don't know where it came from." A reasonable interpretation of this testimony is that there were rumors that he and Appellant had been racing. According to Juror 25, the unidentified juror stated only that he had heard the rumors that the two had been racing as they approached the intersection. The unidentified juror did not vouch for the credibility of the rumors or supplement Kaylor's trial testimony in any way. This stands in sharp contrast with *Doan,* where the juror in question "conducted an out-of-court experiment and reported her findings to the jury in the manner of an expert witness." *Id.* at 733. *See also Parker v. Gladden,* 385 U.S. 363, 363–64, 87 S.Ct. 468, 470, 17 L.Ed.2d 420 (1966) (bailiff told the jury during deliberations that the defendant was a "wicked fellow," that he was guilty, and that any error in finding the defendant guilty would be corrected by the Supreme Court); *Mattox v. United States,* 146 U.S. 140, 142–43, 13 S.Ct. 50, 51–52, 36 L.Ed. 917 (1892) (bailiff made inappropriate remarks to the jurors regarding the defendant's guilt and informed them that this was the third man he had killed; also, newspaper article that commented on the strength of the evidence against the defendant was brought into the jury room and read aloud in the presence of the jury); *Ne Camp v. Commonwealth,* 311 Ky. 676, 225 S.W.2d 109, 111–12 (1949) (one juror told another during deliberations that she had sought the advice of a priest who advised her that it would not be a sin to impose the death penalty).

Juror 25's affidavit contains no evidence of outside influence, but only that a juror had heard elsewhere about a matter that was also mentioned during trial testimony. Nor are the other jurors' statements cited by Appellant evidence of outside influence. Each of these statements is merely a response to an inference of racing that could reasonably be drawn from the evidence presented at trial. Therefore, because these juror statements do not establish improper outside influence upon the jury, they cannot be considered for the purpose of impeaching the verdict.[3] *Jones,* 450 S.W.2d at 814.

---

3. Appellant also argues that the jury's alleged discussion of these rumors ran afoul of the "appearance of evil" doctrine. *See, e.g.,* *Young v. State Farm Mut. Auto. Ins. Co.,* 975 S.W.2d 98, 99–100 (Ky.1998); *Dillard v. Ackerman,* 668 S.W.2d 560, 563 (Ky.App.1984).

*B. Withholding information during voir dire.*

██ Appellant claims that his right to an impartial jury was violated when at least one juror withheld material information during voir dire. He argues that the affidavit and the newspaper article prove that a juror or jurors knew of the rumors about racing before trial and withheld that information when the trial court asked the following question during voir dire: "Does anyone have any knowledge as to the facts and circumstances of this case?"

██ It is well settled that "[t]o obtain a new trial because of juror mendacity, 'a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.'" *Adkins v. Commonwealth,* 96 S.W.3d 779, 796 (Ky.2003) (quoting *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984)). The evidence cited by Appellant falls short of meeting this standard. For example, in *Paenitz v. Commonwealth,* 820 S.W.2d 480 (Ky.1991), we remanded for a new trial where there was evidence to prove that a juror withheld the fact that she had discussed the *details* of the case with the government's expert witness prior to trial. *Id.* at 481. In contrast, Juror 25's statements, if taken as true, do not indicate that the unidentified juror had knowledge of the facts and circumstances of Appellant's case; indeed, the only allegation was that the unidentified juror had heard rumors. If this did actually occur, we can only speculate as to the amount and substance of these rumors, given the threadbare allegations set forth by Appellant.

In circumstances where no challenge is made to juror qualification prior to or during trial and the challenge first occurs after rendition of a verdict, a party seeking relief from the effect of the verdict bears a heavy burden. It is incumbent upon such a party to allege facts, which if proven to be true, are sufficient to undermine the integrity of the verdict.

*Gordon v. Commonwealth,* 916 S.W.2d 176, 179 (Ky.1995). In light of the speculative nature and paper-thin credibility[4] of Appellant's allegations, we hold that the trial court did not abuse its discretion in overruling Appellant's motion for a new trial. *Cf. Key v. Commonwealth,* 840 S.W.2d 827, 830 (Ky.App.1992) (jury verdict affirmed where defendant failed to elicit testimony from juror in question and the only evidence offered showed nothing more than speculation that juror was biased).

## III. UNPRESERVED ISSUES.

██ During an in-chambers hearing before Appellant's trial began, the prosecutor informed the court and defense counsel that "even if [Kaylor and Appellant] were racing, the race would have ended

---

This doctrine has usually been applied where actual prejudice is difficult to prove, but there has always been readily provable patently improper conduct on the part of an actor in a position to influence the jury. In the case *sub judice,* Appellant is not only unable to establish prejudice; he also has fallen short of showing improper conduct.

4. The Department of Public Advocacy conducted telephone interviews with several jurors and had a hearing at which Appellant had the opportunity to present witnesses in support of his new trial motion. Despite all of this, the only sworn statement Appellant ever presented was Juror 25's hearsay allegation, which never identified its declarant. Appellant could have subpoenaed all of the jurors to the hearing so that Juror 25 could identify the declarant who could then be questioned about the nature and extent of the information he allegedly withheld.

when Kaylor gets ready to turn [off of Pembroke Road]," and that the evidence would therefore not show that they were racing through the intersection where the collision took place. The prosecutor also stated that while Kaylor would testify about the manner in which he and Appellant were driving, he would not testify that the two were racing. Indeed, Kaylor never testified that he was racing with Appellant. During Kaylor's direct and cross-examinations, no mention was made of the racing rumors in the community. On redirect examination, the prosecutor asked Kaylor if he had entered a guilty plea in response to a wanton endangerment charge, and Kaylor answered that he had entered an *Alford* plea. On recross, defense counsel followed up this inquiry by asking Kaylor what he had done to merit the wanton endangerment charge. Kaylor responded, "As far as I was concerned, I didn't do anything wrong, but it got started somehow that I was racing, when I in fact wasn't. I really don't know where it came from." Appellant concedes that he did not object to the prosecutor's inquiry, but he seeks review for palpable error on grounds that the prosecutor should not have been permitted to elicit new evidence on redirect examination.[5] Accordingly, we review for manifest injustice. RCr 10.26.

 As a general rule, redirect examination should be limited to questions explaining matters that have been developed on cross-examination. *E.g., White v. Commonwealth,* 292 Ky. 416, 166 S.W.2d 873, 877 (1942). Nevertheless, "[t]rial courts have always had substantial discretion to allow departure from these norms.... The language of KRE 611(a), giving trial judges 'reasonable control over the mode and order of interrogating witnesses,' is

consistent with the wide discretion trial courts have always had over the nature and scope of redirect and recross examination." Robert G. Lawson, *The Kentucky Evidence Law Handbook,* § 3.20[5], at 245 (4th ed. LexisNexis 2003) (quoting KRE 611(a)) (internal footnotes omitted). Given the trial court's wide discretion to allow this inquiry, and the fact that the testimony was otherwise admissible as impeachment evidence, Appellant suffered no manifest injustice from its admission.

 Appellant also claims that the trial court committed palpable error by permitting the prosecutor to engage in misconduct during his closing argument. In considering alleged prosecutorial misconduct during closing argument, we review to determine "whether the conduct was of such an 'egregious' nature as to deny the accused his constitutional right of due process of law." *Slaughter v. Commonwealth,* 744 S.W.2d 407, 411 (Ky.1987). Appellant bases his first allegation of prosecutorial misconduct upon a comparison of the prosecutor's pretrial representations, noted above, with statements in his closing argument in which he invited the jury to draw an inference that Appellant and Kaylor were racing at some point during the events leading up to the collision. In closing argument, "[i]t is the duty of the prosecuting attorney to confine himself to the facts in evidence and fair inferences that may be drawn therefrom." *Williams v. Commonwealth,* 644 S.W.2d 335, 338 (Ky. 1982). While no witness in the case *sub judice* explicitly testified that Appellant was racing with Kaylor, there was evidence adduced at trial that supported an inference that Appellant and Kaylor were racing one another before Kaylor slowed his vehicle to turn off of Pembroke Road.

---

**5.** Appellant does not assert that it was error for the Commonwealth to elicit this evidence as substantive evidence of his own guilt. *See*

*Tipton v. Commonwealth,* 640 S.W.2d 818, 820 (Ky.1982); *Parido v. Commonwealth,* 547 S.W.2d 125, 126 (Ky.1977).

The prosecutor relied on this evidence as an illustration of the general manner in which Appellant was operating his vehicle during the time leading up to the collision, arguing: "Is racing an issue here? I don't know. Is driving fast an issue? Absolutely." The prosecutor's closing argument was not inconsistent with his pretrial representations, as Kaylor did not testify that he and Appellant were racing. However, admissible evidence heard by the jury supported that inference, and the prosecutor's pretrial statements were not misleading; thus, Appellant suffered no manifest injustice from this part of the Commonwealth's closing argument.

 Finally, Appellant asserts palpable error arising from a portion of the closing argument in which the prosecutor stated, "Kaylor pled guilty to first-degree wanton endangerment for operating his vehicle in the manner he did." Appellant argues that this statement constituted both bolstering of Kaylor's testimony and an improper characterization of Kaylor's *Alford* plea. Both claims are meritless. Nothing in the statements cited by Appellant indicates that the prosecutor vouched for the credibility of Kaylor's testimony. *Compare Armstrong v. Commonwealth*, 517 S.W.2d 233, 236 (Ky.1974) (prosecutor's closing argument was improper bolstering where he told jury that he had known and worked with witness for a long time and that witness was honest and conscientious). Moreover, the prosecutor committed no misconduct in referring to the *Alford* plea as a guilty plea. *See Alford*, 400 U.S. at 37, 91 S.Ct. at 167 ("the Constitution is concerned with practical consequences, not the formal categorizations, of state law"). Furthermore, "[a]n *Alford* plea is a 'plea of guilty,' regardless of any denial of underlying facts ...." *Pettiway v. Commonwealth*, 860 S.W.2d

766, 767 (Ky.1993). No manifest injustice resulted from this reference.

Accordingly, the judgment of convictions and the sentences imposed by the Christian Circuit Court are AFFIRMED.

LAMBERT, C.J.; COOPER, GRAVES, JOHNSTONE, SCOTT, and WINTERSHEIMER, JJ., sitting.

LAMBERT, C.J.; GRAVES, JOHNSTONE, and WINTERSHEIMER, JJ., concur.

SCOTT, J., concurs in part and dissents in part by separate opinion.

Justice SCOTT Concurring in Part and Dissenting in Part.

While I agree with the majority on the issues of "alleged juror misconduct" and "unpreserved issues," I respectfully dissent on the sufficiency of the evidence to support the "wanton murder" charges.

"In our dedication to severely punish...drivers who kill, a dedication which I share, we have grown indifferent to the difference between murder and manslaughter, an indifference which I do not share." *Bush v. Commonwealth*, 839 S.W.2d 550, 558 (Ky.1992). (Leibson, J., dissenting). "I concede that fatal carelessness in the operation of a motor vehicle calls for stern punishment, but murder is something else. There simply is a difference in culpability between committing an act that endangers people whose presence is known and an act that endangers people whose presence should be anticipated, but in fact is not known." *Hamilton v. Commonwealth*, 560 S.W.2d 539, 544 (Ky.1977), (Palmore, C.J., dissenting).

In this case, Demond Brown "[d]oes not fit the description of [a] wanton murderer absent further circumstances indicating a heedless disregard for victims he is **consciously aware of.**" *Bush. supra*, (Leib-

son, J., dissenting). "By virtue of the...opinion in this case...the distinction between wanton murder and reckless homicide will be lost." *Estep v. Commonwealth,* 957 S.W.2d 191, 194 (Ky.1997) (Lambert, C.J., dissenting). Why?

Around 10:00 p.m., on January 15, 2002, 19 year old Demond Brown (Brown) was returning home with his younger brother and girlfriend. He had just picked up his girlfriend, Laticia Leavell, from her job at Meritor in Hopkinsville, Kentucky, where he also worked. Leaving the Meritor parking lot, he pulled out on Pembroke road, which is a four-lane highway with a speed limit of 55 miles per hour. He then traveled six-tenths of a mile from the parking lot to the intersection of Pembroke and Martin Luther King Jr. Parkway (the By–Pass).

Credible evidence, both from witnesses, as well as the investigating officers, established his speed on Pembroke road between 60 and 65 miles per hour. Then, as he approached the intersection, he saw he had a red light. He took his foot off of the gas peddle, but then glanced over and saw what he thought was the opposing lights go yellow to red. Mistakenly believing his light would now turn green, he drove on into the intersection. In fact, his light remained red and he struck another car, killing Debra Conklin and her daughter, Megan.

The majority concedes there was no evidence introduced at trial indicating either Brown, or his passengers, ever saw Ms. Conklin's vehicle and that the "[i]nference that Brown did not see the impending collision was reinforced by the fact that his vehicle left no skid marks on the road prior to the point of impact." Moreover, all parties concede no drugs or alcohol were involved.

Yet, Brown was convicted of two counts of "wanton murder" and two counts of wanton endangerment, 1st degree, and was sentenced to 20 years each on the wanton murders and 1 year each on the wanton endangerments, all to run concurrently for a total of 21 years. Pursuant to KRS 439.3401(3), he will not be eligible for parole until he has served 17 years of his sentence.[1] He will then be near 40 years old. Prior to this tragic event, he had a job, owned a car and was never in trouble, other than a couple of traffic tickets.

Evidence at trial suggested (but never said) Brown was racing with Michael Kaylor (Kaylor) just prior to running the red light. Kaylor also worked at Meritor and had been Brown's supervisor. That night, Kaylor left the factory at the same time as Brown, but never spoke to Brown.[2]

According to Kaylor, when he pulled out, he followed Brown down Pembroke, staying one to two car lengths behind him, traveling "about" 65 miles per hour. Again, it was six-tenths of a mile from the exit at the Meritor parking lot to the intersection. This intersection had a turn lane which was four-hundred eighty feet long from its beginning up to the intersection. Once he came to the turn lane, Kaylor turned into it in preparation to turn right on the Martin Luther King Jr. by-pass, which was the way he drove home from work.

Dewayne Thomas, another Meritor employee left the parking lot at the same time (10:00 p.m.) and was immediately

1. In contrast, Larry Mahoney, drove into a bus going the wrong way in a drunken stupor, killing twenty-seven people. He was sentenced to 16 years and released on probation after serving 9 years. *Commonwealth v. Mahoney,* 1988–CA–001635–MR.

2. Everyone on the evening shift gets off at 10:00p.m.

passed by both Brown and Kaylor as they exited out of the parking lot. He testified "they went by me like I was sitting still." However, when this comment was further explored, he acknowledged he was only 50 feet up to 50 yards from the parking lot exit and doing 35–40 miles per hour. Earlier he had indicated he was doing about 50 miles per hour when they went by him.[3] Later he testified, "I seen what they were doing," but he never said the word racing.

Brown, on the other hand, was driving a 1994 Ford Crown Victoria. In fact, it was a former city police cruiser which had actually belonged to Detective Mayse, the police re-constructionist who testified in the case. Detective Mayse admitted it had the special engine found in police cars. It doesn't take a rocket scientist to know a police cruiser is capable of doing much more than 60–65 miles per hour in six-tenths of a mile (from the parking lot to the intersection). Which poses the question, were Brown and Kaylor really racing? Or, if they were, they obviously quit before Kaylor exited to the turn lane and Brown approached the light at the intersection. The turning lane started 480 feet prior to the intersection; at 88 feet per second, at 60 miles per hour, that's five and one-half seconds (51/2) from the start of the turn lane to the intersection.

However, for purposes of consideration of this case, let's assume they were doing some "undefined form of restrained racing" at 60–65 miles per hour on a 55 mile per hour four-lane, prior to the time Kaylor withdrew and exited to the turn lane, for his right hand turn.

In contrast to the "suggestion of racing" as the cause of the collision, the Commonwealth also introduced evidence that Brown's vehicle had two T.V. screens

mounted in the front. One was cut into a hole where the old glove box would normally be, while the other was suspended near the floor from the gearshift. These were very small screen T.V.'s but only one worked. There was no evidence that the T.V. had any capability of playing video movies or accessing T.V. signals.

Calvin Quick, another Meritor employee and a passenger in the car driven by Dewayne Thomas, testified that when he walked by Brown's car in the parking lot, the T.V. was playing. Brown agreed and testified he and his brother were playing with their Playstation on the T.V. screen while they were waiting in the parking lot for Laticia, his girlfriend. Brown, his brother and Laticia were clear that the one working T.V. screen was not in use when the collision occurred.

Mr. Quick, who Brown passed coming out of the parking lot, at first believed it was in use when he was passed, but later acknowledged that the windows were tinted on Brown's vehicle and he could have just seen a blank blue screen. However, one should recall that Mr. Quick's observation came at a point either 50 feet or 50 yards from the parking lot at a time when the driver of his vehicle (Thomas) indicated "they went by me like I was sitting still." Almost six-tenths of a mile still remained to the intersection.

So what have we got? A young kid who made a terribly tragic mistake in thinking his light would turn green and ended up killing two innocent people. Something he'll regret for the rest of his life. But is he guilty of "wanton murder" as the majority says, as opposed to being guilty of second degree manslaughter and/or reckless homicide?

---

**3.** It would indeed be a surprise if one could reasonably accelerate to 50 miles per hour in 50 feet or even 50 yards.

The majority has set out the appropriate standard for reviewing questions regarding the sufficiency of the evidence. All fair and reasonable inferences are to be drawn in the Commonwealth's favor. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). But, what inferences are fair and reasonable?

After traveling six-tenths of a mile from the Meritor parking lot, Brown approached the red light at the intersection of Pembroke and Martin Luther King Jr. bypass. At this time, or prior thereto, someone in the vehicle may have, or may not have, been looking at, or playing with, the T.V. screen. Brown was driving, his girlfriend was sitting in the front passenger seat, and his brother was sitting in the back seat. After the accident, the Playstation was in the floor of the right front passenger compartment where his girlfriend was sitting. It may have been, or may not have been, in that location prior to the accident. This is where they were using it in the parking lot.

Brown was driving a former police cruiser with the capability to reach significant speeds in the six-tenths of a mile from the parking lot to the light at the intersection. Prior to his approach to the intersection, he may have, or may not have, been involved in "some form of undefined restrained racing" with Michael Kaylor; doing 60–65 miles per hour on a four-lane highway with a posted speed limit of 55 miles per hour. Whether he was, or was not, doing anything in this regard prior to approaching the intersection, Michael Kaylor turned into a turn lane to make a right hand turn and that turn lane started four-hundred eighty feet prior to the intersection. As noted, a vehicle doing 60 miles per hour travels 88 feet per second.

Prior to approaching the intersection, Brown noticed that the light was red and took his foot off the gas peddle. As he testified, he then saw what he thought was the opposing light go from yellow to red, and expecting his light to turn green, he drove into the intersection. As noted by the majority, there was no evidence at trial indicating he, or even his passengers, ever saw the Conklin vehicle. The inference that this was so is reinforced by the fact his vehicle left no skid marks on the road prior to the point of impact.

The question then becomes whether Brown, under these facts and taking all reasonable inferences in favor of the Commonwealth, can be guilty of wanton murder as opposed to second degree manslaughter and/or reckless homicide? "A person is guilty of murder when:...(b) including, but not limited to, the operation of a motor vehicle under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person." KRS 507.020. Stated in another way, can we say, on these facts, that a reasonable juror could believe beyond a reasonable doubt that Appellant's conduct "manifested extreme indifference to human life?"

"This Court has held that a conviction of wanton murder is reserved exclusively for offenders who manifest virtually no concern for the value of human life." *Johnson v. Commonwealth*, 885 S.W.2d 951, 952 (Ky.1994); *Kruse v. Commonwealth*, 704 S.W.2d 192 (Ky.1985); *Harris v. Commonwealth*, 793 S.W.2d 802 (Ky.1990); *Nichols v. Commonwealth*, 657 S.W.2d 932 (Ky. 1983).

One would presume this reservation is based upon the severity of the potential sentence. Wanton murder is a Class A felony with a penalty of twenty years to life. Second degree manslaughter is a Class C felony with a maximum sentence of ten years. Reckless homicide, the least

culpable of the three, has a maximum penalty of five years in the penitentiary. Moreover, pursuant to KRS 439.3401(3), Capital, Class A and B felonies are generally classified as "violent offender" offenses, subject to an 85% serve out of the sentence imposed. Class C and D felonies are not subject to this 85% serve out rule.

The majority's logic to avoid the constraints set out in *Johnson, Kruse, Harris* and *Nichols, supra,* is contained in four sentences.

"Appellant's conduct was substantially more than a mere traffic violation. In addition to driving at a rate exceeding the speed limit and violating the traffic signal, there was substantial evidence that Appellant was watching television rather than monitoring the traffic at the intersection and that he had attempted to 'time' the traffic light despite the fact that it remained red at all times during his approach. Moreover, from the testimony regarding the manner in which Appellant and Kaylor operated their vehicles and Kaylor's unusual conduct after the collision, the jury could reasonably have inferred that Appellant and Kaylor were racing during the period immediately preceding the collision and that Appellant ran the red light to "outrun" Kaylor, not realizing that Kaylor had slowed down to turn onto the bypass. **While the evidence was by no means overwhelming on these points,** we cannot say as a matter of law that it was unreasonable for the jury to believe beyond a reasonable doubt that Appellant acted under circumstances manifesting extreme indifference to human life." (Slip opinion p. 9–10).

Brown **was driving** at a rate exceeding the speed limit. This was a 55 mile per hour four-lane and the evidence established he was driving 60–65 miles per hour. **In civil cases, we have denied "punitive damages" on accidents up to ten miles per hour over the speed limit, even when the collision occurs in the wrong lane. *See Kinney v. Butcher,* 131 S.W.3d 357 (Ky.App.2004).** "Kinney also alleged that Butcher was traveling 55 miles per hour in a 45 mile per hour zone,..." *Id.* at 358. We agree with the trial court's assessment of the circumstances of this case to the effect that traveling at a possible speed of ten miles per hour in excess of the posted speed limit and failing to complete a pass before entering a no-passing zone constitute nothing more than ordinary negligence. Were we to accept Kinney's argument that it amounts to wanton or reckless disregard for the safety of others, it would effectively eliminate the distinction between ordinary and gross negligence in the context of automobile accidents. Nearly all auto accidents are the result of negligent conduct, though few are sufficiently reckless as to amount to gross negligence, authorizing punitive damages. We are of the opinion that punitive damages should be reserved for truly gross negligence seen in cases such as *Shortridge v. Rice,* 929 S.W.2d 194 (Ky.App.1996), *Stewart v. Estate of Cooper,* 102 S.W.3d 913 (Ky.2003) and *Phelps v. Louisville Water Co.,* 103 S.W.3d 46 (Ky.2003) **In both *Shortridge* and *Stewart,* the defendant tortfeasors were driving while Intoxicated and in** *Phelps,* the jury was presented with eighteen instances where Louisville Water Co., misrepresented the dangerous nature of a highway condition..." *Id.* at 359. And who hasn't driven ten miles per hour over the speed limit on a four-lane highway on occasion? And he did run a red light. However, running a red light is insufficient grounds to support a charge of "wanton murder." *Johnson* at 952.

As to the T.V., there was absolutely no evidence in this case that Brown was watching the television on the approach to

the intersection. There was evidence from Calvin Quick, Dewayne Thomas, and the Appellant that he had been playing the Playstation (using the T.V. screen), while waiting in the parking lot for Laticia. Quick also testified he saw it on when they passed him, which was 50 feet to 50 yards from the parking lot and six-tenths of a mile from the intersection and also at a time when he testified that Brown and Kaylor went by him "like he was sitting still." Yet, Quick was traveling in a vehicle doing "about 35 miles per hour" at the time and 50 feet to 50 yards from the starting point (the parking lot). And, on cross-examination, he admitted he could have just seen a blue screen, since Brown's windows were tinted **and he could not say there was a picture on it.** Brown and all the other occupants in the vehicle said the T.V. was off. Moreover, there was no evidence the T.V. had the capability of picking up local T.V. stations or had any video feed other than its use to play the Playstation. After the accident, the Playstation was in the floor in front of the passenger seat, which was Laticia's position, not Brown's. But that is also where his brother was sitting while they were playing the Playstation while waiting on Laticia in the parking lot.

The majority concurrently suggests, "the jury could reasonably have inferred the Appellant and Kaylor were racing during the period immediately preceding the collision and that Appellant ran the red light to 'outrun' Kaylor." How does someone race a "souped up" police car on a 55 mile per hour four-lane while keeping it between 60–65 miles per hour? Not one person actually testified they were "racing" as we would understand it. Dewayne Thomas said, "I seen what they were doing," but if they were "racing," why wasn't the matter clarified or raised in the evidence? Surely the Commonwealth knew the answer to the follow-up question that was never asked.

The evidence in this case fairly supports a criminal charge deserving of penitentiary time, but it is simply not sufficient to establish conduct "manifesting an extreme indifference to the value of human life," the standard for 20 years to life.

We can say that! We should say that! And we must say that—on these facts! Never before in our jurisprudence have we subjected members of Kentucky's families to convictions of "wanton murder" on facts as these.

Every case I have reviewed where we have upheld a "wanton murder" conviction, (or its close-equivalent, pre-penal code voluntary manslaughter) in the context of a motor vehicle collision, has involved multiple facts indicating a "high rate of speed," "collision in the wrong lane," "running a red light," **coupled with the additional element of intoxication,** except one. *Cook v. Commonwealth,* 129 S.W.3d 351 (Ky.2004); (defendant intoxicated plus "high rate of speed" on "curvy road"); *Love v. Commonwealth,* 55 S.W.3d 816 (Ky.2001) (intoxicated, speeding 70–90 miles per hour—attempting to evade police); *Estep v. Commonwealth,* 957 S.W.2d 191 (Ky.1998) (zonked on drugs—head on collision in wrong lane); *Renfro v. Commonwealth,* 893 S.W.2d 795 (Ky.1995) overruled on other grounds (under the influence of alcohol, driving at a high rate of speed, on wrong side of road and ran a red light); *Walden v. Commonwealth,* 805 S.W.2d 102 (Ky.1991) overruled on other grounds (B.A. of .297 plus high rate of speed, collision across center line); *Keller v. Commonwealth,* 719 S.W.2d 5 (Ky.1986) (intoxicated driver ran head on into victim's car at high rate of speed in wrong lane); *Hamilton v. Commonwealth,* 560 S.W.2d 539 (Ky.1977) (ran red light at high rate of speed in drunken condition).

The one exception was *Graves v. Commonwealth*, 17 S.W.3d 858 (Ky.2000). Astonishingly, *Graves* involved a "running gun battle" during a car chase over a bad drug deal at upwards of over 100 miles per hour through a red light, broadsiding another vehicle, killing the occupants. Even so, the "wanton murder" elements in *Graves*, were only held to have been satisfied under the tenets of *Bennett v. Commonwealth*, 978 S.W.2d 322, 326–328 (Ky. 1998), a doctrine similar to "transferred intent." "Thus viewed, the high speed chase and the exchange of gunfire were but circumstances involved in the method of 'perpetration or attempted perpetration' of the ongoing drug transaction (citations deleted); and that conduct provided the element of aggravated wantonness necessary to convict all three Appellants of the wanton murders..." *Graves, supra*, at 863. Obviously, the facts in this case do not meet the culpability level of a high speed gun battle through a red light during a failed drug deal; nor is there evidence of "criminal intent" sufficient to transfer under the standards of *Bennett* or *Graves*.

Looking next at charges of second degree manslaughter, intoxication still predominates historically as a common element. *Tucker v. Commonwealth*, 2003 WL 23095746 (Ky.App.) (evidence of intoxication, racing and head on collision); *Commonwealth v. Mahoney*, 1988–CA–001635–MR (drunk killed 27 people in a drunken stupor hitting a bus going the wrong way); *Newcomb v. Commonwealth*, 276 Ky. 362, 124 S.W.2d 486, 488 (1939) (pre-penal code—convicted of voluntary manslaughter—"it may be said here that the defendant, in a rattle-trap automobile, was out on a wild party on this Saturday night. All of them were intoxicated. There were four in the driver's seat and two in the rumble").

However, in charges of reckless homicide, you start to see more cases where intoxication was not a factor. *Burchett v. Commonwealth*, 98 S.W.3d 492 (Ky.2003) (ran a stop sign causing death—no direct proof of intoxication—but was reversed to exclude statements of habitual daily use of marijuana); *Commonwealth v. Alexander*, 5 S.W.3d 104 (Ky.1999) (police officer doing 95–100 miles per hour through intersection with emergency lights after emergency had been called off and canceled—hit and killed motorist, **no alcohol or drugs involved**—conviction of reckless homicide affirmed); *Commonwealth v. Harrell*, 3 S.W.3d 349 (Ky.1999) (intoxicated while driving 50 miles per hour in a 35 mile per hour zone—ran red light and hit vehicle killing passenger); *Commonwealth v. Runion*, 873 S.W.2d 583 (Ky.App.1994) (drinking driver hit turning vehicle); *Jones v. Commonwealth*, 830 S.W.2d 877 (Ky.1992) (defendant, while driving under the influence of alcohol struck another vehicle injuring a fetus who died fourteen hours after delivery); *Wilson v. Commonwealth*, 445 S.W.2d 446 (Ky.1969) (drag racing killed motorcyclist, convicted on involuntary manslaughter and 1 year sentence. **Drugs and alcohol were not involved**). *Rouse v. Commonwealth*, 303 S.W.2d 265, 266 (Ky.1957) ("smell of alcohol on Appellant was pretty strong after the accident").

Moreover, the majority opinion embraces the language of KRS 507.020(1)(b), as supporting their affirmance. Yet, in reality, there is no support there as a majority of this Court, right after the enactment of KRS 507.020(1)(b), noted its intent. "[A] drivers inclination to take 'one or more [drinks] for the road,' increases the vehicular death rate on the highways of this Commonwealth. **A majority of the members of this Court [are] of the opinion that the legislature enacted KRS 507.020(1)(b), to deter such con-**

duct. The legislature is commended for taking such a giant step forward. Its actions in enacting this statute will do much to decrease vehicular highway deaths by persons operating an automobile while under the influence of intoxicants." *Hamilton v. Commonwealth,* 560 S.W.2d 539, 544 (Ky.1977).

Then later, consistent with *Hamilton,* we put another brake on the use of "wanton murder" in vehicular homicide cases (not involving intoxicants) by our decision in *Johnson, supra.* In *Johnson,* a heavily loaded coal truck drove through a red light at an intersection on U.S. 23 in Floyd County, striking and killing the occupant of another vehicle. The speed limit on U.S. 23 was 55 miles per hour but the speed of the coal truck was undetermined. In *Johnson,* we said "no evidence was introduced by the Commonwealth of extreme speed or even that the Appellant was exceeding the legal speed limit. Evidence was introduced that the Appellant was not operating the coal truck under the influence of drugs or alcohol;..." *Johnson* at 953. Citing *Hamilton* and *Walden,* cases in which conduct involved both "extreme rates of speed" and "intoxication," we said "there is a noted absence of these factors in the case at hand. **This Court has held that a conviction of wanton murder is reserved exclusively for offenders who manifest virtually no concern for the value of human life."** *Johnson* at 952. If we are now going to leave this road of legal precedent, let's do it intentionally and with knowledge we're leaving—let's don't just drift off inattentively.

And while I agree "the decision as to whether the aggravated circumstances (of extreme indifference to human life and grave risk of death to another) were present is best left up to the jury to decide," *Cook v. Commonwealth, supra* at 363,

there are times, as in *Johnson,* when we have to have the courage to draw the line. Most prosecutors do not want authority to use "wanton murder" charges under circumstances such as this. However, being realists, they must respond to pressures from the public to do something about a particular case. That pressure is greatest where the "results" of the conduct are the most tragic as in this case. Thus, if we open the "flood gate" on "wanton murder" prosecutions in vehicular homicide cases where there is no evidence of intoxicants, or other terrible circumstances more akin to intentional conduct like *Graves* (the "running gun battle" over the failed drug deal), then prosecutors will be forced to use the charge more and more. Why should they have to stand alone in their communities, resisting the pressures of the public (and the press), when the consequences of an incident are indeed terrible, aside from questions of the degree of culpability of the participants. They look to us too—and we should not set down our burden so lightly.

That the conduct of the defendant in this case may have been "wanton" is certainly debatable; that the conduct manifested "an extreme indifference to the value of human life" is not. "To explode a barrel of gun powder in a crowded street, and kill people is murder, although the actor hopes that no such harm will be done. But to kill a man by careless riding in the same street would commonly be manslaughter." *Justice Holmes, Holmes, the Common Law* p. 60. The maximum sentence for a "wanton" act of "second degree manslaughter" is 10 years, not 20 to life. "All we know who lie in jail—are that the walls are strong—and each day is like a year—a year whose days are long." Oscar Wilde, *The Ballad of Reading Jail* IV, St. 1.

While we have the power, to some extent, to interpret, control, or influence, the

boundaries of criminal conduct, we must always strive to maintain the standards of punishment at determinative levels based upon the culpability involved. If this case stands affirmed, we have not met our obligation—we have laid it down.

For the reasons set out, I would reverse this conviction due to the insufficiency of the evidence to support the charge of "wanton murder" and would remand it to the trial court for a new trial on the charges of "second degree manslaughter" and "reckless homicide."